**Louise GLOVER and Ned Measel, Appellants,**

v.

**Thomas W. COLE, President of West Virginia State College, Appellee.**

**No. 84–1033.**

United States Court of Appeals, Fourth Circuit.

Argued Feb. 7, 1985.

Decided May 23, 1985.

Robert S. Baker, Beckley, W.Va. (Adler & Baker, Beckley, W.Va., on brief), for appellants.

Ann V. Gordon, Asst. Atty. Gen., Charleston, W.Va. (Chauncey H. Browning, Atty. Gen., Charleston, W.Va., on brief), for appellee.

Before MURNAGHAN and SPROUSE, Circuit Judges, and HAYNSWORTH, Senior Circuit Judge.

MURNAGHAN, Circuit Judge:

## I

Louise Glover and Ned Measel seek an injunction against Thomas W. Cole, president of the West Virginia State College, insuring them the right to solicit donations on campus and sell newspapers and other literature on behalf of the Socialist Workers Party and the Young Socialist Alliance. The United States District Court for the Southern District of West Virginia held that Cole's enforcement of a state-wide policy, prohibiting on-campus sales and fund raising activities by groups not sponsored by students or the college, did not violate the First Amendment rights of Glover and Measel.

The essential facts were stipulated at a hearing on plaintiffs' motion for injunctive relief. Glover and Measel are members of the Socialist Workers Party and the Young Socialist Alliance. For about one year prior to the present action, the two organizations—none of whose members attend the West Virginia State College—had been allowed to set up an information table adjacent to the student union building of the West Virginia State College, in Institute, West Virginia. The table has served as the principal place where plaintiffs engage passers-by in discussions of political and social issues and distribute free copies of socialist newspapers and related reading materials. Plaintiffs admit that the college has allowed them freedom to espouse their political and social beliefs throughout the college campus. They concede there has been no direct infringement on their ability to speak.

A dispute began when plaintiffs were observed attempting to sell their newspapers. After being compelled to discontinue newspaper sales by a security guard, plaintiffs requested permission from the college administration to sell newspapers and political pamphlets, including *The Militant* and *Young Socialist*, and to solicit donations on behalf of their organizations. President Cole, acting through an assistant, denied the request based on a statewide policy directive from the West Virginia State Board of Education, which prohibits "all solicitation and selling of products and articles upon property under the jurisdiction of the West Virginia Board of Education ... except by organizations and groups directly connected with the institution and upon

written approval of the respective presidents or superintendents."[1] Neither group here is connected with the college.

The college administration, acting pursuant to another policy statement—West Virginia Board of Regents Policy Bulletin No. 55—had opened its facilities to non-campus organizations on certain conditions, including a lease from a campus sponsor and evidence of adequate insurance protection.[2] The administration grants permission to all groups without regard to political philosophy, race, or religion. In the past, the college sponsored a lecture series, a religious elementary school held a concert, and eastern mystics gave a talk about their beliefs. In addition to opening its facilities for use by the general public, the West Virginia State College maintains a campus generally open to the public for political debate.[3] No group, however, has ever been given permission to solicit donations or sell any items on campus.

At the hearing, Cole asserted that the solicitation ban was necessary to preserve the campus area for the peaceful enjoy-

1. The quoted regulation, known as "Administrative Memorandum No. 6," was promulgated in 1952. Although the college is now controlled by the West Virginia Board of Regents, President Cole reasonably concluded that he was bound by Administrative Memorandum No. 6 because the rule had not been directly contravened or superseded by the Board of Regents. On June 12, 1984, Policy Bulletin 55 of the Board of Regents was amended to incorporate the quoted anti-solicitation rule. In addition, both sides agree that the policy directive operates as a complete ban against all solicitation by non-college groups and that college groups can engage in fund raising activities only with written approval from the administration.

2. Policy Bulletin 55 was promulgated by the West Virginia Board of Regents on September 10, 1982. The directive provides, in pertinent part:

**POLICIES ON USE OF INSTITUTIONAL FACILITIES**

Facilities of institutions under the governance of the West Virginia Board of Regents are intended for use in the conduct of its educational programs. As such, first priority for the use of facilities will be given to the academic, administrative and student functions at each institution.

In its many aspects of service to the public, the Board of Regents also recognizes the need and permits the use of facilities which may provide benefits otherwise not available in the community. Consideration of requests from campus and off-campus groups will be guided by the following policy statements.

A. *By Off-Campus Groups or Individuals* (Non-State Employee)

It is the policy of the Board of Regents to permit the use of facilities by the general community in a manner which does not compete with the ongoing programs of the colleges and universities of the State. The community use of a college or university facility must have an educational or cultural purpose and must have a campus sponsor. The facilities that will be made available to non-campus groups will tend to be of a nature which is unique in the community.

Use of campus facilities by non-campus individuals or organizations will be permitted within the following guidelines:

1. Facilities and support services will be made available only to the extent that their proposed use is not in conflict with the regular programs of the institution.

2. The nature of the activities of the non-campus users shall not be potentially physically disruptive of the campus. For instance, local noise ordinances must be obeyed. While this policy may not be construed to preclude use of facilities based on political philosophy, race, religion, or creed of the sponsor, the nature of the activities to be conducted on the campus shall not be illegal under the Constitution or laws of the State of West Virginia or the United States.

3. A standard rental/lease agreement (attached) accompanied by evidence of such insurance protection as may be required to adequately protect the institution shall be executed by the campus sponsor and also be signed by a responsible officer of the non-campus organization desiring to use a campus facility.

3. Glover and Measel were not formally operating under the aegis of the above policy statement, which primarily governs the rental of college facilities. Dr. Floydelh Anderson, an executive assistant to President Cole, testified at a hearing on plaintiffs' motion for a permanent injunction that the administration traditionally operates an open campus. He further explained that the college never had to "approve" plaintiffs' on-campus political activity, although he noted that plaintiffs' organizations were welcome and, in fact, had participated in some college classes. Plaintiffs became entangled with the bureaucratic machinery only after a security guard interceded to block an attempted sale of literature.

ment by students and faculty members.[4] Defendant further asserted that if the ban was lifted, the campus would become inundated by those seeking to solicit donations or sell products, interfering with the college's ability to provide educational services as well as its ability to provide security for students, faculty, and staff.[5] Plaintiffs, in response, did not seek to prove that other non-college groups have received more favorable treatment. There was no showing that others are permitted to sell newspapers or other materials.[6] There has been no suggestion that other groups unconnected with the college have been permitted to do any of the things plaintiffs insist they are constitutionally entitled to do. Furthermore, no showing has been made that any group not connected with the campus has been permitted to conduct activities with commercial overtones even if they had entered a lease, provided evidence of insurance protection, or identified a campus sponsor. Instead the plaintiffs' proof was restricted to establishing that several student groups directly connected with the West Virginia State College have engaged in limited fund-raising activities both inside and outside of school buildings.

Based on the above stipulated record, the district court denied plaintiffs' motion for a permanent injunction and declaratory relief and entered judgment in favor of President Cole. The court found that, although plaintiffs' proposed activity was protected by the first amendment, the policy was a reasonable time, place, and manner restriction and served a significant governmental interest in maintaining an orderly flow of campus traffic and in preserving the peaceful enjoyment of the campus for legitimate educational objectives, free from the possible harassment by plaintiffs' proposed additional activities.

## II

■ By now, our constitutional jurisprudence has settled that "state colleges and universities are not enclaves immune from the sweep of the First Amendment." *Healy v. James*, 408 U.S. 169, 180, 92 S.Ct. 2338, 2345, 33 L.Ed.2d 266 (1972). Indeed, experience and basic sense teach that the "campus of a public university, at least for its students, possesses many characteristics of a public forum," *Widmar v. Vincent*, 454 U.S. 263, 267 n. 5, 102 S.Ct. 269, 273 n. 5, 70 L.Ed.2d 440 (1981). A college milieu is the quintessential "marketplace of ideas."

In the face of these respected constitutional tenets, President Cole suggests that the dispute can be resolved by analogy to the "commercial solicitation" cases. He contends that plaintiffs' sales activity does not enjoy the full panoply of first amendment protection, but instead is subject to the "intermediate scrutiny" peculiar to commercial speech. *E.g., Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980); *Ohralik v. Ohio State Bar Association*, 436 U.S. 447, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978). All the college has prohibited, says Cole, is the exchange of money, a restriction on a purely commercial transaction.

■ There is, however, no certain refuge in platitudes from the commercial speech

---

4. The college is located on an 83 acre parcel of land and contains numerous buildings, including classrooms, administrative facilities, student union, and residence halls. During any regularly scheduled class period, there may be as many as 1300 students on campus or as few as 50.

5. Cole's concern about a flood on the campus was based, in part, on a series of incidents over the years by various people trying to sell items on the college campus.

6. At oral argument counsel for appellants asserted that other newspaper vendors are allowed to sell on campus. First, there is no suggestion that the other vendors additionally solicit donations. Second, the point can only be made by going outside the record, something we are unwilling to do, especially since newspaper contents, while generally protected by the first amendment, cannot be assumed, in the total absence of proof, or absence of any opportunity on the part of the defendants to advance proof, to possess such status. Judicial notice is an inappropriate device for remedying a failure of proof.

cases. The fallacy in applying that approach here is the somewhat plastic distinction between plaintiffs' "pure speech" and their commercial activity. As plaintiffs point out, fund raising may be part and parcel of their political advocacy. *See Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 632, 100 S.Ct. 826, 833, 63 L.Ed.2d 73 (1980) (soliciting funds for political purposes falls within core first amendment protection and traditionally has not been dealt with as a variety of commercial speech). In addition, plaintiffs' distribution of literature does not lose first amendment status simply "because the written materials sought to be distributed are sold rather than given away, or because contributions or gifts are solicited in the course of propagating the faith." *Heffron v. International Society for Krishna Consciousness*, 452 U.S. 640, 647, 101 S.Ct. 2559, 2563, 69 L.Ed.2d 298 (1981). Their message may be different, but street corner pamphleteers are in the mold of Thomas Paine. To treat them as mere commercial actors, relegated to a subordinate role in our constitutional scheme, is to deny an essential part of our political history.

■ What the case is about is not whether plaintiffs are engaged in core first amendment activity. Nor is the case about whether non-students have the right to enter the college campus to espouse a particular political view; plaintiffs have already been allowed to speak freely. Rather, the case involves the narrowly focused issue of whether the state properly exercised its right a) to regulate the manner by which third parties may make use of its educational institutions and b) to restrict essentially unregulated approaches to students who are at a stage in life where the primacy of education in its claim to their atten-

tion rather sets them apart from the body politic, indiscriminately viewed.

Both sides to the dispute seem to have conceded that the campus area is a "limited" public forum. *See Perry Educational Association v. Perry Local Educators*, 460 U.S. 37, 103 S.Ct. 948, 955 & n. 7, 74 L.Ed.2d 794 (1983).[7] The plaintiffs have stipulated that the anti-solicitation policy has been applied even-handedly to all non-student groups and have conceded in their brief that the rule is a content-neutral time, place, and manner restriction which only incidentally restricts first amendment activity. So viewed, the regulation will be upheld as long as Cole demonstrates that the restriction is narrowly tailored to serve a significant governmental interest and that there are ample alternative channels of communication. *See Heffron v. International Society for Krishna Consciousness*, 452 U.S. at 647–48, 101 S.Ct. at 2563–64, *quoting Virginia Pharmacy Board v. Virginia Citizens Consumer Council*, 425 U.S. 748, 771, 96 S.Ct. 1817, 1830, 48 L.Ed.2d 346 (1976).

Unquestionably, the regulation furthers the state's recognized interest in regulating the manner by which third parties make use of its educational facilities. As the Supreme Court opined in *Widmar v. Vincent*, 454 U.S. at 267–68 n. 5, 102 S.Ct. at 273–74 n. 5:

[O]ur cases have recognized that First Amendment rights must be analyzed 'in light of the special characteristics of the school environment.' A university differs in significant respects from public forums such as streets or parks or even municipal theaters. A university's mission is education, and decisions of this Court have never denied a university's authority to impose reasonable regula-

---

7. We agree with the concession. In the case of the defendant, as Dr. Johnson testified, the West Virginia State College has always been operated as an "open campus." Thus, according to the record the campus by tradition was dedicated by the college administration to free and open expression by all members of the public for the

purpose of enriching the educational community. There is no evidence, however, that the campus was open for indiscriminate use by the public. For non-student groups, the campus has never been opened for fund raising activities. *See Perry*, 103 S.Ct. at 956.

tions compatible with that mission upon the use of its campus and facilities. We have not held, for example, that a campus must make all of its facilities equally available to students and non-students alike, or that a university must grant free access to all of its grounds or buildings.

Although its campus is open, West Virginia has set aside the campus as an area for peaceful use by students and faculty. Those in charge of the state college thus have a significant interest in protecting the students from the harassment of insistent hawkers and possibly fraudulent solicitations and in preventing the area from becoming overrun and overcrowded. The state college is dedicated to the pursuit of vigorous debate in a halcyon educational setting. To that end, the Board of Regents, and the college itself, have taken rather commendable steps to open the campus, allowing both on- and off-campus groups the use of school facilities for educational and cultural activities. However, the college fastidiously has avoided transforming the campus area into an unlimited arena for charitable, political, or commercial solicitation. It had a right to take steps to safeguard the traditional academic atmosphere. *See Grayned v. City of Rockford,* 408 U.S. 104, 116, 92 S.Ct. 2294, 2303, 33 L.Ed.2d 222 (1972) (the nature of a place and pattern of its normal activities dictate which time, place, and manner regulations are reasonable).[8]

The exception allowing sales or solicitation on behalf of student groups, upon prior written approval, does not set up an arbitrary distinction sufficient to create any doubt about the sincerity of the reason for imposing a blanket prohibition on non-college groups. For students, the campus is the only forum where, as a practical matter, they can raise funds to sponsor their education oriented activities, many of which are directly related to college life. More importantly, the college obviously has more control over student groups and can, with little cost or effort, monitor their activities and impose necessary sanctions without the formality which would attend sanctions and regulation of third party soliciting groups. In short, the distinction drawn by the Board of Regents is rational and consistent with the goal of preserving the campus for the educational objectives of the students.

Glover and Measel recognize that the college administration can enforce time, place, and manner restrictions on the use of the campus, but insist that the rule is unconstitutional as applied to them. Glover and Measel point out that the record is "devoid of any suggestion" that they have disrupted the campus or that their organization is fraudulent in any way. Consequently, while the solicitation regulation furthers a significant interest, none of those interests, according to Glover and Measel, justify the application of the rule against their limited activities.

In support of their "as applied" argument, Glover and Measel principally rely on *Tinker v. Des Moines Independent School District,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) for the proposition that "undifferentiated fear or apprehension is not enough to overcome the right to freedom of expression." *Id.,* at 508, 89 S.Ct. at 737. *Tinker,* however, offers no support for plaintiffs' position and, in fact, the differences in that case only highlight the weakness in the present attack. *Tinker* involved the rights of students to engage in a symbolic protest of the Vietnam war. At issue was invidious state suppression of particular expressive activity, activity which was unpopular in the local community. Consequently, the Court held that the "mere desire to avoid the discomfort and unpleasantness that always accompany an

---

**8.** The evenhandedness of the college's approach to the problem does nothing to condemn it in a constitutional sense. While compliance with the equal protection strictures of the Fourteenth Amendment does not excuse violation of another constitutional protection, it does lessen the likelihood of such a violation.

unpopular viewpoint" was no justification for eliminating student activity which was not in any way incompatible with the function of the school.

The present dispute is a far cry from *Tinker*. Unlike *Tinker*, here, only a neutral time, place, and manner restriction has been challenged. The regulation has not singled out solicitation and fund raising on behalf of socialist organizations. In addition, it is undisputed that Cole operates an open campus and encourages free and robust debate. Most importantly, *Tinker* nowhere suggests that everyone has an absolute right to use all parts of a public school for unlimited purposes. No Supreme Court case has so held.

Glover and Measel also challenge the regulation because it was not narrowly drawn to further the designated state interests. Several possibilities are offered. If traffic and peaceful harmony are the concern, they argue that fund-raising can be banned in the more congested areas and can be limited to certain hours. In addition, if fraud is a concern, the college could impose some form requiring registration or disclosure of interests.

Although we recognize that a more tailored approach is theoretically possible, we hold that the school acted within bounds in deciding that its limited resources are not well spent on policing a regulation for the benefit of third parties rather than on enhancing the principal objective, *i.e.*, education. Moreover, although Glover and Measel have brought an "as applied" challenge, the court cannot limit its analysis to the effect of granting what essentially would be an exemption for their organization. *See Heffron v. International Society for Krishna Consciousness*, 452 U.S. at 652–54, 101 S.Ct. at 2566–67. If the restriction is invalid as applied to Glover and Measel, it is no more valid if applied to other *bona fide* political or charitable organizations seeking to use the campus on the same basis. Viewed in the aggregate, the solution to the problem was reasonable.

*See Clark v. Community For Creative Non-Violence*, —— U.S. ——, 104 S.Ct. 3065, 3079–71, 82 L.Ed.2d 221 (1984).

### III

There has been no direct infringement on Glover's and Measel's expressive activity, simply a prohibition against sales and fund-raising on campus. Since the campus area is generally open for all debate and expressive conduct, we do not find that first amendment interests seriously are damaged by the administration's decision to limit the use of its property through uniform application of a sensible "manner" restriction. Plaintiffs' activities may be at the core of the first amendment, but the college has a right to preserve the campus for its intended purpose and to protect college students from the pressures of solicitation. In so ruling, we note that plaintiffs have more than ample alternative channels available to tap the student market for fund raising. The literature itself sets out in plain English requests for donations for the cause. Anyone interested enough to peruse the material learns that the preparation of the materials costs something and that the group is in need of financial (as well as moral and political) support. In addition, if the campus is plaintiffs' key market, they can organize a student group or obtain a student sponsor to raise funds on campus. In light of the limited restriction on plaintiffs' activities, we will uphold the decision of the district court.

AFFIRMED.