Todd FOX, Edward R. Detweiler, Stephanie Vaiano, James B. Cullen, Christine Marie Odell, Steven Gawley, Daniel Altman, Philip Jay Botwinik, Jeffrey S. Zellan, Jaclyn Bernstein, and American Future Systems, Inc., Plaintiffs,

Todd Fox, Edward R. Detweiler, Stephanie Vaiano, James B. Cullen, Christine Marie Odell, Steven Gawley, Daniel Altman, Philip Jay Botwinik, Jeffrey S. Zellan, and Jaclyn Bernstein, Appellants,

v.

The BOARD OF TRUSTEES OF the STATE UNIVERSITY OF NEW YORK and Clifton R. Wharton, Jr., Individually and as Chancellor of the Board of Trustees and the State University of New York College at Cortland, and James M. Clark, Individually and as President of the College at Cortland, and the State University of New York at Binghamton, and Clifford D. Clark, Individually and as President of the State University of New York at Binghamton, and the State University of New York at Albany, and Vincent O'Leary, Individually and as President of the State University of New York at Albany, and the State University of New York College of Arts and Sciences at Potsdam, and Humphrey Tomkin, Individually and as President of the College of Arts and Sciences at Potsdam, Appellees.

No. 117, Docket 87-7296.

United States Court of Appeals,
Second Circuit.

Argued Oct. 23, 1987.

Decided March 11, 1988.

**1208**

Henry T. Reath (Wayne A. Mack, Jr., Duane, Morris & Heckscher, Philadelphia, Pa.; Ronald H. Sinzheimer, Albany, N.Y., of counsel), for appellants.

Daniel Smirlock, Asst. Atty. Gen. (Robert Abrams, Atty. Gen. of the State of N.Y., Peter Schiff, Deputy Sol. Gen.; Nancy A. Spiegel, Asst. Atty. Gen., Albany, N.Y., of counsel), for appellees.

Lanny E. Walter, Walter, Thayer & Long, Albany, N.Y., for amicus curiae Student Ass'n of the State University of New York, Inc.

Lewis B. Oliver, Jr., Oliver & Oliver, Albany, N.Y., for amici curiae Student Ass'n of the University at Albany, University at Albany's Tenant Ass'n, Cortland College Student Ass'n.

Michael Griffinger, Crummy, Deldeo, Dolan, Griffinger & Vecchione, Newark, N.J., for amicus curiae American Future Systems, Inc.

Before OAKES, CARDAMONE and MAHONEY, Circuit Judges.

OAKES, Circuit Judge:

This case commenced when a corporation selling housewares to college students challenged a university regulation barring its access to student dormitory rooms. Initially only one student who wished to host a housewares demonstration joined the suit. He argued that the university regulation impaired his constitutional right to receive information in his dormitory room. The United States District Court for the Northern District of New York, Neal P. McCurn, Judge, granted a preliminary injunction utilizing commercial free speech analysis. *American Future Sys., Inc. v. State Univ.*, 565 F.Supp. 754 (N.D.N.Y.1983). Additional students then joined the suit. After a non-jury trial, the district court turned away from the students' First Amendment rights and focused on the houseware company's efforts to enter the university. *Fox v. Board of Trustees*, 649 F.Supp. 1393, 1398–1402 (N.D.N.Y.1986). On appeal, the focus of the case shifted. The housewares company dropped out as a party and is now merely an amicus. Numerous students and student organizations joined as amici curiae. The university, however, is still fighting the case as it began, and we note that the lawyers representing the students originally represented the housewares company. Yet, the case no longer involves an effort by outsiders to gain access to university property; rather it concerns only the constitutional rights of students in their dormitories. Accordingly, we reverse and remand for further proceedings in light of this opinion.

### BACKGROUND

Appellants are students at various campuses of the State University of New York (SUNY), in particular, at Cortland, Albany, and Binghamton. The appellees are the Board of Trustees of SUNY, the chancellor of SUNY, SUNY colleges at Cortland, Albany, Binghamton, and Potsdam, and their respective presidents.

SUNY requires all freshmen, sophomores, and new transfer students to live in college-operated housing. Only students over twenty-one years of age, married students, students with prior military service, and students living at home with parents are exempt. All students living in SUNY

housing sign a "license" covering room and board. They agree to pay a specific amount for the academic year (subject to change by the SUNY trustees) in return for room and board "in the residence halls operated by the College subject to the rules and regulations of the College with respect to its students." The rules and regulations are described in the license and in university and college publications. One such publication, known as *RALPH*, is furnished by the residence life staff to all Cortland students. It sets forth the students' rights and responsibilities. *RALPH* is replete with assurances that the university will respect students' right to privacy in their dormitory room.

> As a member of the residence hall community and as a tenant of the College, you have a right to privacy in your own room. You should in no way be subject to arbitrary entry or searches by College officials or by anyone else. Additionally, you do not have the right at any time to enter another student's room without his or her specific permissions [*sic*].

> The College cannot, and will not, authorize any person to enter your room without your specific permission. The City Police Department, Campus Public Safety, and other law enforcement agencies are subject to the legal processes which govern entry into any dwelling.

*RALPH* informs students that law enforcement officials seeking entry to a student's room must have a search warrant which the student has a right to see. No member of the college or residence hall staff can enter a student's room without at least twenty-four hours' advance notice, except in "emergency situations when there is a reasonable fear of imminent danger to life, safety, health, or property."

Most of the campus living situations have unlimited visitation hours, although in a few dormitories visits may occur only from 6:00 a.m. to midnight, Sunday to Thursday, and from 6:00 a.m. to 2:00 a.m. on Friday and Saturday. Any visitor who stays past midnight must register with residence hall staff.

In 1966 the SUNY Board of Trustees adopted Resolution 66–156 which, as amended by Resolution 73–26 in 1973 and by Resolution 79–100 in 1979, reads as follows:

> No authorization will be given to private commercial enterprises to operate on State University campuses or in facilities furnished by the University other than to provide for food, legal beverages, campus bookstore, vending, linen supply, laundry, dry cleaning, banking, barber and beautician services and cultural events.

The parties stipulated that the Resolution (hereinafter "the Regulation") prevents SUNY students from inviting into their dormitory rooms commercial enterprises or persons who furnish information, provide a product, or provide a service where a fee is charged or a profit involved. A statement of SUNY's policy prohibiting "selling and soliciting merchandise and services in residence halls" appears in *RALPH* and other university publications.

The commercial enterprise which precipitated this case and at least one other, *see American Future Sys., Inc. v. Pennsylvania State Univ.*, 752 F.2d 854 (3d Cir.1984), *cert. denied*, 473 U.S. 911, 105 S.Ct. 3537, 87 L.Ed.2d 660 (1985), is American Future Systems, Inc. ("AFS"). AFS sells cookware, china, crystal, and silverware to college students through group demonstrations arranged by students. It obtains students' names from student directories and referrals, or through a procedure called "chatterbooking." In chatterbooking, an AFS representative invites students to register for a vacation drawing. AFS then promises a free Florida vacation to students who invite friends to an AFS demonstration in their dormitory rooms.

The instant controversy arose when SUNY/Cortland officials told Kathy Rapp, the AFS regional director, to leave a dormitory room where she was giving an AFS presentation. When she refused, she was arrested and ultimately charged with loitering, soliciting without a permit, and trespass. AFS, Rapp, and Todd Fox, a SUNY/Cortland student who had been de-

nied permission to host an AFS presentation in his dormitory room, brought suit. In his affidavit, Fox referred to the prohibition against the AFS presentation as "an unjustified intrusion on my rights, as a student, to privacy and to speak and associate freely with others of my choice in my dormitory room." He asserted that "the presentation, if held at a reasonable hour, would not have intruded in any way on the privacy of other dormitory students in my residence hall." The affidavit stated that Fox "wanted the opportunity to see the [AFS] products and to hear and participate in the presentation and discussion about the products, cooking, nutrition, budgetary planning and other matters," and to observe the art of salesmanship. Fox indicated that "[a] variety of noisy and disruptive activities go on in the dormitories on a regular basis," including "blaring stereos, electric guitar playing, raucous behavior, loud music, parties, drinking of alcoholic beverages, etc., [which] present a much greater potential for disruption" than a sales presentation. Fox reported that SUNY/Cortland students use their dormitory rooms for private day-to-day living activities but generally study elsewhere, at the university library, the student union building, classrooms, or study rooms.

The district court preliminarily enjoined the university from prohibiting demonstrations in the dormitory rooms of a consenting SUNY/Cortland student. *American Future Sys.*, 565 F.Supp. 754. It did not, however, "restrain defendants from promulgating and enforcing reasonable restrictions governing the time, place, and manner of such demonstrations." *Id.* at 771. Judge McCurn also refused to enjoin the ban on actual sales of AFS products.

In response, SUNY/Cortland promulgated regulations forbidding the consummation of all sales on campus. In addition, they restricted AFS presentations to certain hours, confined the presentations to student rooms where all roommates had given written permission, and limited the number of participants to ten. The regulations also required the resident hosting the AFS presentation to complete satisfactorily a registration form and to be present throughout the demonstration.

At trial,[1] SUNY officials testified that permitting commercial presentations on university property would dramatically increase the number of people on campus. They suggested this would disrupt the academic environment and endanger students' safety. Establishing a checkpoint system to monitor the additional traffic on campus, they contended, would require additional personnel at a substantial cost to the university. SUNY/Albany officials testified that when they had permitted commercial enterprises to operate in the college's common areas, sales personnel had flooded the campus.

The district court characterized the speech in question as commercial speech. *Fox*, 649 F.Supp. at 1398. However, the court concluded that because the speech took place on government property, the public forum approach was appropriate. *Id.* at 1398–99 (citing *Perry Educ. Ass'n v. Perry Local Educators*, 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983); *Cornelius v. NAACP Legal Defense & Educ. Fund*, 473 U.S. 788, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985); *Calash v. City of Bridgeport*, 788 F.2d 80 (2d Cir.1986); *Glover v. Cole*, 762 F.2d 1197 (4th Cir.1985)). Since the university permitted social, cultural, and educational activities in the dormitories while prohibiting commercial activities, Judge McCurn concluded that SUNY dormitory rooms constituted limited public fora. *Id.* at 1400–01 (citing *Cornelius*, 473 U.S. at 802, 105 S.Ct. at 3449, and *Calash*, 788 F.2d at 83–84; distinguishing *Chapman v. Thomas*, 743 F.2d 1056 (4th Cir.1984), *cert.*

**1.** The plaintiffs added defendants and amended the pleadings several times before the case was tried. The presidents of SUNY/Albany, SUNY/Binghamton, and SUNY/Potsdam were added as defendants. On April 15, 1984, the court extended the preliminary injunction to these additional defendants. The pleadings were amended to challenge both the SUNY Resolution 66–156 and the subsequently issued Cortland regulations. Several student plaintiffs were dropped or added consistent with their matriculation at the various state colleges. In addition, Kathy Rapp was dropped as a plaintiff.

*denied,* 471 U.S. 1004, 105 S.Ct. 1866, 85 L.Ed.2d 160 (1985), and *Pennsylvania State,* 752 F.2d at 870–71 (Adams, J., concurring)). The district court also held that the restriction in the Regulation was viewpoint neutral because it applied equally to AFS, pizza vendors, doctors, lawyers, and all other nonstudents motivated by profits. *Id.* at 1401. Finally, the district court concluded that the Regulation was reasonable in relation to its purpose—that is, preserving the educational environment, assuring student safety, preventing commercial exploitation of students, avoiding the use of tax-supported facilities for private commercial gain, and preventing overcrowding in the dormitories. *Id.* at 1402. Having found the SUNY Regulation to be a reasonable, viewpoint-neutral restriction on commercial speech in a limited public forum, the district court dismissed the complaint. This appeal ensued.

## DISCUSSION

We start with the proposition that students, particularly college students, "do not 'shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.'" *Hazelwood School Dist. v. Kuhlmeier,* —— U.S. ——, ——, 108 S.Ct. 562, 567, 98 L.Ed.2d 592 (1988), *rev'g* 795 F.2d 1368 (8th Cir.1986) (quoting *Tinker v. Des Moines Indep. Community School Dist.,* 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969)). *Accord Wood v. Strickland,* 420 U.S. 308, 326, 95 S.Ct. 992, 1003, 43 L.Ed.2d 214 (1975); *Healy v. James,* 408 U.S. 169, 180, 92 S.Ct. 2338, 2345, 33 L.Ed.2d 266 (1972). As *Healy* said,

> Of course, as Mr. Justice Fortas made clear in *Tinker,* First Amendment rights must always be applied "in light of the special characteristics of the ... environment" in the particular case. And, where state-operated educational institutions are involved, this Court has long recognized "the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." Yet, the precedents of this

Court leave no room for the view that, because of the acknowledged need for order, First Amendment protections should apply with less force on college campuses than in the community at large. Quite to the contrary, "[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools."

408 U.S. at 180, 92 S.Ct. at 2345–46 (citations omitted).

■ Accordingly, the courts have extended Fourth Amendment protection to college students in respect to their dormitory rooms. *E.g., Piazzola v. Watkins,* 442 F.2d 284, 289–90 (5th Cir.1971); *Morale v. Grigel,* 422 F.Supp. 988, 997 (D.N.H.1976); *Commonwealth v. McCloskey,* 217 Pa.Super. 432, 272 A.2d 271 (1970). This has also been the law of New York, at least as expressed in *People v. Cohen,* 57 Misc.2d 366, 292 N.Y.S.2d 706 (Dist.Ct.1968), *aff'd,* 61 Misc.2d 858, 306 N.Y.S.2d 788 (Sup.Ct. 1969). *RALPH,* the SUNY/Cortland student informational booklet, recognizes that students in dormitory rooms, like all tenants, enjoy the right of privacy and freedom from an unreasonable search or seizure. Similarly, we agree that students who are required to live on campus and in a dormitory room should not be deprived of any rights to free speech or expression that they would have were they living off campus, absent a showing by the university that its educational mission would be "materially disrupt[ed]." *Tinker,* 393 U.S. at 513, 89 S.Ct. at 740.

■ One of the constitutional rights enjoyed by students, of course, must be the right to receive information. *See Pacific Gas & Elec. Co. v. Public Util. Comm'n,* 475 U.S. 1, 106 S.Ct. 903, 907, 89 L.Ed.2d 1 (1986) (plurality opinion). As Paul Freund wrote twenty-seven years ago, "[t]he right to speak is the individualized legal reflection of the more generalized right to hear, which is basic to the process of political flux." P. Freund, *The Supreme Court of the United States* 81 (1961). The Supreme Court has recognized the right to receive information and ideas in a variety of con-

texts. *See, e.g., Procunier v. Martinez,* 416 U.S. 396, 408–09, 94 S.Ct. 1800, 1809, 40 L.Ed.2d 224 (1974) (nonprisoners' right to receive correspondence from prisoners); *Lamont v. Postmaster Gen.,* 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965) (rights of mail recipients); *Thomas v. Collins,* 323 U.S. 516, 534, 65 S.Ct. 315, 324, 89 L.Ed. 430 (1945) (rights of workers to hear labor organizers); *Martin v. City of Struthers,* 319 U.S. 141, 143, 63 S.Ct. 862, 863, 87 L.Ed. 1313 (1943) (rights of residents to receive handbills at their door). As Justice Powell wrote in his concurring opinion in *Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 76, 96 S.Ct. 2440, 2455, 49 L.Ed.2d 310 (1976): "[t]he primary concern of the free speech guarantee is that there be full opportunity for expression in all of its varied forms to convey a desired message. Vital to this concern is the corollary that there be full opportunity for everyone to receive the message." The right to receive information and ideas as embodied in the First Amendment is reflected in privacy cases, *e.g., Stanley v. Georgia,* 394 U.S. 557, 564, 89 S.Ct. 1243, 1247, 22 L.Ed.2d 542 (1969); *Griswold v. Connecticut,* 381 U.S. 479, 482, 85 S.Ct. 1678, 1680, 14 L.Ed.2d 510 (1965) (plurality opinion), and lies at the very foundation of the so-called commercial free speech cases which have been an area of developing Supreme Court jurisprudence over the last fifteen years. *See, e.g., Bolger v. Youngs Drug Prods. Corp.,* 463 U.S. 60, 73–75, 103 S.Ct. 2875, 2883–85, 77 L.Ed.2d 469 (1983); *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council,* 425 U.S. 748, 756–57, 96 S.Ct. 1817, 1822–23, 48 L.Ed.2d 346 (1976). *Cf. Posadas de Puerto Rico Assoc. v. Tourism Co.,* 478 U.S. 328, 106 S.Ct. 2968, 2976, 92 L.Ed.2d 266 (1986); *In re R.M.J.,* 455 U.S. 191, 204 n. 17, 102 S.Ct. 929, 938 n. 17, 71 L.Ed.2d 64 (1982); *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n,* 447 U.S. 557, 561–62, 100 S.Ct. 2343, 2348, 65 L.Ed.2d 341 (1980); *Bates v. State Bar of Arizona,* 433 U.S. 350, 364, 97 S.Ct. 2691, 2699, 53 L.Ed.2d 810 (1977); *Carey v. Populations Servs.*

*Int'l,* 431 U.S. 678, 700–01, 97 S.Ct. 2010, 2024, 52 L.Ed.2d 675 (1977); *Linmark Assoc. v. Township of Willingboro,* 431 U.S. 85, 92, 97 S.Ct. 1614, 1618, 52 L.Ed.2d 155 (1977); *Bigelow v. Virginia,* 421 U.S. 809, 822, 95 S.Ct. 2222, 2232, 44 L.Ed.2d 600 (1975).

The right to receive information and ideas is particularly important for students. As Justice Brennan recognized, "such access prepares students for active and effective participation in the pluralistic, often contentious society in which they will soon be adult members." *Board of Educ. v. Pico,* 457 U.S. 853, 868, 102 S.Ct. 2799, 2808, 73 L.Ed.2d 435 (1982) (plurality opinion). Justice Brennan was referring to junior high and high school students; surely the right to receive information is at least as critical to university students.

■ Since this case no longer involves the rights of third persons to gain access to state-owned property to give or receive speech, but rather the free speech rights of students who, as dormitory residents, have an undisputed right of access to their rooms as well as certain privacy rights, the public forum cases thought applicable by the district court are inapposite. *Cornelius,* 473 U.S. at 793, 105 S.Ct. at 3444 (legal defense and political advocacy organizations sought access to federal employees' charity drive); *Perry Educ. Ass'n,* 460 U.S. at 38–41, 103 S.Ct. at 951–52 (teachers' union sought access to school mail facilities); *Calash,* 788 F.2d at 81 (concert promoter sought access to municipal stadium); *Glover,* 762 F.2d at 1198 (political party members sought access to college campus). Nor are we concerned with a student's right to free expression on the university campus other than in the dormitory room, *e.g., Widmar v. Vincent,* 454 U.S. 263, 268 n. 5, 102 S.Ct. 269, 273 n. 5, 70 L.Ed.2d 440 (1981), or a student's right to solicit door-to-door in university dormitories, *Chapman,* 743 F.2d 1056.[2]

In this case the university's Regulation limits the students' right to receive infor-

---

**2.** Since this case concerns students' rights to free speech in their dormitory rooms and no-

where else on university campus, the public forum analysis of *Hazelwood* is inapplicable.

mation and hear speech in their dormitory rooms. The constitutionality of that regulation depends upon the degree of protection extended to the speech involved. Here, as Judge McCurn correctly found, the communication the students wish to receive is commercial speech. *See Fox,* 649 F.Supp. at 1398; *American Future Sys.,* 565 F.Supp. at 761–63. AFS demonstrations propose a commercial transaction, the sale of AFS products. The communication, therefore, is commercial, *Central Hudson,* 447 U.S. at 562, 100 S.Ct. at 2349; *Virginia Pharmacy,* 425 U.S. at 762, 96 S.Ct. at 1825, notwithstanding the fact that it may contain some noncommercial elements. *See Bolger,* 463 U.S. at 67–68, 103 S.Ct. at 2880; *Pennsylvania State,* 752 F.2d at 860–62.

In commercial speech cases, the Supreme Court instructs us to apply a four-part analysis first set forth explicitly in *Central Hudson,* 447 U.S. at 561–66, 100 S.Ct. at 2348–51. We must first determine whether the expression is protected by the First Amendment, which requires that the commercial speech concern lawful activity and not be misleading. Second, we must ask whether the asserted governmental interest is substantial. Then, we must determine whether the Regulation directly advances the governmental interest asserted and whether it is not more extensive than is necessary to serve that interest. *Posadas,* 106 S.Ct. at 2976; *Central Hudson,* 447 U.S. at 566, 100 S.Ct. at 2351.

As to the first prong of the *Central Hudson* test, the district court found, when granting a preliminary injunction, that AFS demonstrations concerned lawful activity and were not misleading. 565 F.Supp. at 763–64; *see also Pennsylvania State,* 752 F.2d at 863. This finding was not challenged at the trial on the merits notwithstanding evidence that students agreed to host AFS demonstrations only after unsolicited mailings and telephone calls promised vacations and gifts.

■ The burden therefore shifts to the state not merely to assert that it has a substantial interest but to demonstrate that interest by real evidence. The govern-

mental interests asserted by SUNY, we agree, are substantial: (1) prevention of crime, *Posadas,* 106 S.Ct. at 2977; *City of Watseka v. Illinois Pub. Action Council,* 796 F.2d 1547, 1551 (7th Cir.1986), *aff'd,* —— U.S. ——, 107 S.Ct. 919, 93 L.Ed.2d 972 (1987); (2) protection against consumer exploitation, *see Ohralik v. Ohio State Bar Ass'n,* 436 U.S. 447, 464–65, 98 S.Ct. 1912, 1922, 56 L.Ed.2d 444 (1978); (3) preservation of residential tranquility, *Carey v. Brown,* 447 U.S. 455, 471, 100 S.Ct. 2286, 2295, 65 L.Ed.2d 263 (1980); *cf. Village of Belle Terre v. Boraas,* 416 U.S. 1, 9, 94 S.Ct. 1536, 1541, 39 L.Ed.2d 797 (1974); *but cf. Tinker,* 393 U.S. at 508, 89 S.Ct. at 737 (undifferentiated fear of disturbance does not overcome right to free expression); and (4) promotion of education. *Hazelwood,* —— U.S. at ——, 108 S.Ct. at 567.

It is less clear, however, that the Regulation directly advances the State's interests; the Regulation cannot be sustained if it only provides "ineffective or remote support for the government's purpose." *Central Hudson,* 447 U.S. at 564, 100 S.Ct. at 2350. Arguably, limiting the number of persons permitted entry to dormitories helps preserve quiet and reduce the possibilities of crime, and barring direct selling minimizes the opportunities for exploitation. *See Pennsylvania State,* 752 F.2d at 865 & n. 30 (barring commercial solicitations promotes dormitories as study and residential areas). The fact that the Regulation is under-inclusive because it does not bar disruptions such as loud music or parties or commercial solicitation through the mail, television, or newsprint does not mean it does not "directly advance" the asserted governmental interests. *See Posadas,* 106 S.Ct. at 2977. Whether SUNY offered sufficient evidence to meet its burden is not evident as the district court considered only whether the Regulation was reasonably related to the asserted governmental interests, not whether it directly advanced them.

■ However, even if the Regulation directly advances substantial governmental interests, it must be no "more extensive than is necessary to further [the state's]

interests." *Central Hudson,* 447 U.S. at 566, 100 S.Ct. at 2351. SUNY argues that *Central Hudson* does not require the "least restrictive means," citing *Pennsylvania State,* 752 F.2d at 865–66. In that case, the Third Circuit concluded that since the "narrowly tailored to serve a significant governmental interest" language in *Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984), does not require "least restrictive means," neither does *Central Hudson's* "not more extensive than necessary" language. We disagree. *Central Hudson* makes clear that "if the governmental interest could be served as well by a more limited restriction on commercial speech, the excessive restrictions cannot survive." 447 U.S. at 564, 100 S.Ct. at 2350. The *Posadas* Court's deference to the legislature's assessment of the least restrictive effective measure implicitly endorsed that test. 106 S.Ct. at 2978. Moreover, the Court observed that "rational basis" equal protection analysis was easier to satisfy than the *Central Hudson* test, thereby rejecting a reasonable relationship test for commercial speech. *Id.* at 2979 n. 9. Here the district court's ultimate holding was based only on the reasonableness of the Regulation. 649 F.Supp. at 1402. Indeed, the district court found that "there is support in the record for the plaintiffs' position that a less restrictive measure might better balance the respective interests of the parties...." *Id.*

The SUNY Regulation survived constitutional scrutiny below only because the First Amendment rights of students were ignored. In light of the district court's thorough familiarity with the case, we have little doubt but that on remand under the analysis this opinion imposes, the court will be able to make appropriate findings and draw a suitable order.

Judgment reversed; cause remanded. Costs to neither party.

MAHONEY, Circuit Judge, dissenting:

I respectfully dissent.

Other circuit courts have considered this issue, or cognate issues, and have concluded that university regulations of this nature do not offend the first amendment. Specifically, the Third Circuit concluded, in *American Future Systems, Inc. v. Pa. State Univ.,* 752 F.2d 854 (3d Cir.1984), *cert. denied sub. nom. Johnson v. Pa. State Univ.,* 473 U.S. 911, 105 S.Ct. 3537, 87 L.Ed.2d 660 (1985) ("*American Future Systems*"), that Pennsylvania State University could legitimately prohibit group sales demonstrations by American Future Systems, Inc., *amicus* here and a plaintiff below, in individual student rooms.[1] The majority opinion, in which the two other panel members who wrote separately concurred, see *id.,* 752 F.2d at 867, 872, premised this result on a commercial speech analysis. Circuit Judge Adams, concurring, opined that the result could be justified by a number of rationales, including commercial speech analysis, time, place and manner restrictions, special considerations pertinent to a university setting, and public forum analysis. *Id.,* 752 F.2d at 867–71 (Adams, J., concurring).

The Fourth Circuit considered the general question in *Glover v. Cole,* 762 F.2d 1197 (4th Cir.1985), and *Chapman v. Thomas,* 743 F.2d 1056 (4th Cir.1984), *cert. denied,* 471 U.S. 1004, 105 S.Ct. 1866, 85 L.Ed.2d 160 (1985). *Glover* held that West Virginia State College could validly enforce on its campus a state-wide policy prohibiting on-campus sales and fund raising activities by groups not sponsored by students or the college. The challenge there was posed by representatives of the Socialist Workers Party and the Young Socialist Alliance. *Chapman* concluded that North Carolina State University could constitutionally prohibit door-to-door solicitations in university dormitories, and apply that prohibition to a student who sought to promote attendance at Bible discussions on the university campus by such solicitations. The discussions

---

1. A later enacted ban prohibited use of the common areas of dormitories for commercial demonstrations, as well, but the validity of the broader ban was not considered in that litigation. *See id.,* 752 F.2d at 860 n. 21.

were sponsored by the Church of Christ, a fundamentalist, evangelical church.

Against this backdrop, I would not invalidate on first amendment grounds the regulation which SUNY seeks to enforce here. If, as the district court deemed appropriate below, a "public forum" analysis is employed, the Supreme Court has explicitly held that a "decision to restrict access of a non-public forum need only be *reasonable;* it need not be the most reasonable or the only reasonable limitation." *Cornelius v. NAACP Legal Def. & Educ. Fund,* 473 U.S. 788, 808, 105 S.Ct. 3439, 3453, 87 L.Ed. 2d 567 (1985) (emphasis in original). A "limited" public forum, which allows some, but less than indiscriminate, access to outsiders on terms which do not include the litigant seeking access, is subject to this analysis. See *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 47–48, 103 S.Ct. 948, 956, 74 L.Ed.2d 794 (1983).

I do not understand the majority to assert that the SUNY regulation at issue here does not meet this test of reasonableness. Rather, the majority employs the "commercial speech" analysis articulated in *Central Hudson Gas & Elec. Co. v. Public Serv. Comm'n,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980), concluding that: (1) since the district court considered, under its "public forum" analysis, whether the SUNY regulation is reasonably related to the asserted governmental interests, rather than, as the *Central Hudson* test mandates, whether it "directly advance[s]" them, 447 U.S. at 564, 100 S.Ct. at 2350, the district court's affirmative conclusion on this point is suspect; and, more dispositively, (2) *Central Hudson,* in specifying that "excessive restrictions cannot survive" if "the governmental interest could be served as well by a more limited restriction on commercial speech," *id.,* imposes a "least restrictive means" requirement. On the latter point, the majority rejects the contrary conclusion reached by the Third Circuit in *American Future Systems,* 752 F.2d at 865–66.

I do not find this analysis persuasive. First, I don't see a significant difference between the "reasonable relationship" and "directly advances" criteria as to promotion of the admittedly substantial government interests which SUNY asserts in support of its regulation, believe that the situation before us can be validly analyzed under either approach, *see generally American Future Systems,* 752 F.2d at 867–71 (Adams, J., concurring), and in any event would find either test satisfied on this record.

Secondly, I do not believe that *Central Hudson* should be read as imposing a "least restrictive alternative" requirement. That case did not, on its facts, address such a question, since the regulation at issue there imposed a *complete* ban on advertising to promote the use of electricity. *Central Hudson,* 447 U.S. at 558, 100 S.Ct. at 2347. Moreover, subsequent to the Third Circuit's ruling in *American Future Systems,* which I find persuasive in any event, the Supreme Court has squarely rejected the "least restrictive alternative" requirement in the cognate "public forum" area, *Cornelius v. NAACP Legal Def. & Educ. Fund,* 473 U.S. 788, 808, 105 S.Ct. 3439, 3453, 87 L.Ed.2d 567 (1985), and has emphasized in *Hazelwood School Dist. v. Kuhlmeier,* —— U.S. ——, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988), that "the education of the Nation's youth is primarily the responsibility of parents, teachers and state and local school officials, and not of federal judges." *Id.,* 108 S.Ct. at 571 (citations omitted).[2] In light of these subsequent developments, and since *Central Hudson* did not, in my view, initiate a "least restrictive alternative" requirement, I would not impose such a requirement here.

I conclude, with Judge Adams of the Third Circuit, that:

---

**2.** It should be noted that *Hazelwood* dealt with a school newspaper produced in conjunction with the journalism class of a public high school, and expressly reserved the question "whether the same degree of deference is appropriate with respect to school-sponsored expressive activities at the college and university level." *Hazelwood,* 108 S.Ct. at 571 n. 7. I would not read this reservation, however, as totally undercutting *Hazelwood's* applicability here.

With all due respect, I do not believe that the First Amendment's protection of a free and robust marketplace of ideas requires that a university dormitory be turned into a marketplace for a private corporation's sale of kitchenware. *American Future Systems*, 752 F.2d at 871 (Adams, J., concurring).[3]

I would therefore affirm, and accordingly dissent.

---

**3.** More colorfully, Judge Adams posed the issue elsewhere in his concurrence as "involving a corporation's right to hawk housewares in a college dormitory ..." *Id.* at 867. I do not regard the issue as substantially transformed simply because the corporation in question, a party below, has adopted an *amicus* posture on this appeal. The essential nature of the commercial transaction and resulting free speech issue remains before us, although admittedly now to be viewed from the vantage of the student-hawkees.