**ACLU STUDENT CHAPTER—UNIVERSITY OF MARYLAND, COLLEGE PARK, et al., Plaintiffs**

v.

**C.D. MOTE, Jr., Defendant**

**No. CIV.A.RWT 03–636.**

United States District Court, D. Maryland, Southern Division.

June 15, 2004.

Anthony C. Epstein, Steptoe and Johnson LLP, Arthur B. Spitzer, American Civil Liberties Union, Washington, DC, David Robert Rocah, American Civil Liberties Union Foundation of Maryland, Baltimore, MD, for Plaintiff.

John K. Anderson, Mark J. Davis, Office of the Attorney General, Baltimore, MD, for Defendant.

## MEMORANDUM OPINION

TITUS, District Judge.

On March 6, 2003 the ACLU Student Chapter—University of Maryland, College Park ("ACLU—UMCP"), and two students at the University of Maryland College Park ("University" or "College Park") sought a declaration from this Court that the University's policy concerning speech on the College Park campus is unconstitutional as a violation of the First Amendment and an injunction enjoining Defendant from restricting speech in public places on the campus. The present matter comes before the Court on the parties' cross-motions for summary judgment.

### I. Background

The State of Maryland has established a system of higher education "[i]n order to foster the development of a consolidated system of public higher education, to improve the quality of education, to extend its benefits and to encourage the economical use of the State's resources." *See* MD. CODE ANN. [EDUC.] §§ 12–101 (2001). College Park is the "flagship" institution of the system. Prior to 2001, the only persons permitted to engage in public speaking on the College Park campus were students, faculty or staff, or other persons within the University community. In 2001, the University chose to open its doors to outsiders (persons not affiliated with the University) who wish to engage in public speech. The University adopted regulations on public speech on the College Park campus that support the right of University community members to "demonstrate and leaflet, provided such activities do not disrupt normal activities or infringe upon the rights of others." *See UM Guidelines on Demonstrations and Leafleting,* General Provisions, ¶ 1. However, "persons who are not members of the University student body, faculty or staff may participate only upon the invitation of

a bona fide student, faculty or staff member engaged in such activity," except as authorized by the University of Maryland Procedures for the Use of Physical Facilities, VI–4.10(A), § II.

University of Maryland Procedures for the Use of Physical Facilities limit the public speech of outsiders who are not sponsored by a University community member to the "Nyumburu Amphitheater stage," and prohibit any distribution of literature on the part of unsponsored outsiders except in "designated sidewalk space outside the Stamp Student Union building." VI–4.10, §§ II.C.1, 3–4.

Any University affiliated group that wishes to use any facility on the College Park campus for the purposes of a planned demonstration must reserve the requested facility at least one business day in advance. *See UM Guidelines on Demonstrations and Leafleting,* Special Guidelines For Scheduled Demonstrations, ¶ 1. An unscheduled demonstration or rally by University organizations, University students or University employees is permitted as long as it does not interfere with any other functions occurring at that facility. *See id.* at Special Guidelines For Unscheduled Demonstrations ¶ 2. Outsiders, however, are specifically required to make reservations for any use of campus facilities "up to five (5) working days in advance of the date of anticipated use," and "[p]riority will be given to University departments, registered student organizations, students, faculty and staff." *See* VI–4.10(A), § II.C.2.

Defendant C.D. Mote, Jr. ("Mote"), the President of the University, is responsible for the conduct of the University, and approved and issued the regulations on public speaking. Plaintiffs sued Mote in both his individual and official capacity. The Plaintiffs in the March 6, 2003, Complaint were the ACLU–UMCP, Daniel M. Sinclair ("Sinclair") and Rebecca J. Sheppard ("Sheppard"). Sheppard and Sinclair, who are University students, claimed that they were unable to hear a variety of viewpoints on the College Park campus, because the University's policies restrict outsider speech to areas of the campus where Sheppard and Sinclair do not have classes or other activities.

On July 29, 2003, Mote filed a motion for summary judgment, asserting that the Plaintiffs in the March 6 Complaint lacked standing because they failed to demonstrate an injury to themselves apart from their allegation that they wished to hear more outside viewpoints and believed they were not able to do so. In response to Mote's motion for summary judgment, the Plaintiffs moved on September 12, 2003, for leave to amend their complaint to include additional plaintiffs who were members of the public and whose speech was directly restricted by the University policy.

On October 3, 2003, the Court denied Mote's motion for summary judgment and granted Plaintiffs' motion for leave to amend their complaint. The Amended Complaint dropped Sheppard as a Plaintiff, but added Matthew Fogg ("Fogg") and Michael Reeves ("Reeves"), two outsiders who allege that the University policy directly restricted and continues to restrict their First Amendment rights. In the October 3 Order, the Court noted that "[i]f a standing issue is again raised, the court will decide whether that issue must be resolved separate from any merits issue."

Both parties have now filed motions for summary judgment. The Plaintiffs argue that the undisputed facts show that the University policy on outsider speech is an unconstitutional restriction on free speech. Mote argues that (1) the Plaintiffs in the Amended Complaint cannot prove any in-

jury and thus have no standing and (2) the University's policy restricting outsider speech is constitutional because it is both viewpoint neutral and reasonable.

## II. Summary Judgment Standard

Under the Federal Rules of Civil Procedure, a party is entitled to a summary judgment if there exists no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. PRO. 56(c). Where, as here, both parties have moved for summary judgment, the Court "must consider each party's motion individually to determine if that party has satisfied the summary judgment standard." *Lucas v. Curran*, 856 F.Supp. 260, 264 (D.Md.1994). The burden of persuasion rests on the moving party. *Id.* Although all references should be drawn in favor of the non-moving party, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. PRO. 56(e); *Lucas*, 856 F.Supp. at 265.

## III. Standing

■ "'Article III of the United States Constitution limits federal courts to resolving actual cases and controversies.'" *Burke v. City of Charleston*, 139 F.3d 401, 404 (4th Cir.1998) (quoting *Finlator v. Powers*, 902 F.2d 1158, 1160 (4th Cir. 1990)). At a minimum, to satisfy Article III and establish standing to sue, Plaintiffs must establish that (1) they have personally suffered actual or threatened injury that is concrete and particularized, not conjectural or hypothetical; (2) the injury fairly can be traced to the challenged action; and (3) the injury is likely to be redressed by a favorable decision from the court. *Burke*, 139 F.3d at 405. The Court recognizes that "every member of the general public suffers injury whenever the First Amendment is violated in a manner that tends to chill the 'uninhibited marketplace of ideas' that the First Amendment pro-

tects." *Lucas*, 856 F.Supp. at 266 (Smalkin, J.) (citing *Frissell v. Rizzo*, 597 F.2d 840, 846 (3d Cir.1979)). However, Article III requires more than simply alleging an abstract, generalized grievance. *Lucas*, 856 F.Supp. at 266. As the Supreme Court observed in *Lujan v. Defenders of Wildlife*, the injury in fact requirement "'requires that the party seeking review be himself among the injured.'" 504 U.S. 555, 563, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (quoting *Sierra Club v. Morton*, 405 U.S. 727, 734, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972)); *see also Lucas*, 856 F.Supp. at 266–67.

With these factors in mind, the Court will now consider the standing of each plaintiff to challenge the University policy.

### A. The ACLU–UMCP & Daniel Sinclair

The ACLU–UMCP is a registered student organization at the University whose mission is to challenge University policies that impinge on civil rights. The ACLU–UMCP claims that the University policy limits the ability of outsiders to reach their desired audience. Daniel M. Sinclair is a University student and the co-president of the ACLU–UMCP who claims that the University's policies prevent him from hearing the broadest viewpoint possible.

■ The Fourth Circuit has ruled that if an individual member of a group has standing, the group itself has associational standing, *see Am. Canoe Ass'n v. County Comm'rs of Carroll County*, 326 F.3d 505, 517–20 (4th Cir.2003); however, in order for the individual members of the ACLU–UMCP to have standing they must be directly affected by the University's policy, "apart from their 'special interest in th[e] subject'" of free speech. *Lujan*, 504 U.S. at 563, 112 S.Ct. 2130 (citing *Morton*, 405 U.S. at 735, 739, 92 S.Ct. 1361). "The

plaintiffs must, therefore, demonstrate that the defendant's conduct directly injures them aside from an injury to their general, or even specific, interest in a particular area of governmental conduct." *Lucas,* 856 F.Supp. at 266–67.

In the *Lucas* case, two plaintiffs claimed that a Maryland state statute that regulated door-to-door solicitation prevented them from exposure to unknown organizations from which they may desire to receive solicitations. *Id.* at 263–64. The Court held that without identifying any specific organization from which the plaintiffs wished to receive information or to whom the plaintiffs wished to donate money, their general claim of harm did not satisfy the injury in fact requirement of Article III. *Id.* at 267–68.

> The requirement that there exists a definite relationship with a specific speaker or speakers in order for a hearer or listener to have standing is essential 'to avoid the kind of broad scale assertion of injury to an undifferentiated public interest,' that is prohibited by the Constitution.

*Id.* (citing *Frissell,* 597 F.2d at 847).

The Court recognizes that members of the ACLU–UMCP, including Sinclair, have a "special interest" in hearing a broad range of viewpoints. However, the Court cannot determine that any members of the College Park community were directly affected by the University policy. Even considering the Plaintiffs' position that the First Amendment protects not only the rights of speakers, but also the rights of listeners, *Virginia Bd. of Pharmacy v. Virginia Citizens Consumer Counsel,* 425 U.S. 748, 756–57, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976), the Court finds that, even as protected listeners under the First Amendment, the injury in this regard asserted by the ACLU–UMCP and Sinclair is merely conjectural.

■ The Plaintiffs, who are members of the University community, do not allege that they were unable to hear a particular viewpoint on the College Park campus that they wished to hear. In fact, the University's sponsorship policy permits any outsider to participate in demonstrations or to distribute leaflets on the same basis as a University member "upon the invitation of a bona fide student, faculty or staff member." *See UM Guidelines on Demonstrations and Leafleting,* General Provisions, ¶ 1. Nowhere in this record is there a suggestion that Sinclair, or any other member of the ACLU–UMCP, attempted to sponsor an outsider and was rejected, nor does the record suggest that Sinclair or any other member of the ACLU–UMCP has not been able to hear a specific viewpoint when he or she wished to do so. Based on these undisputed facts, neither the ACLU–UMCP nor Sinclair can satisfy the injury in fact requirement and, lacking the requisite standing under Article III, summary judgment will, by separate Order, be entered against them.

**B. Matthew Fogg**

According to the Amended Complaint, Fogg is a member of the People's Coalition for Police Accountability ("People's Coalition"), a grassroots organization set up to monitor police behavior in Prince George's County, Maryland. Fogg has engaged in public speaking and the distribution of literature on behalf of the Peoples' Coalition on the College Park campus in the past, but he wishes to engage in public speaking and the distribution of literature in outdoor areas of the campus which are not reserved for outsiders. Fogg admits that he has never made use of the University's sponsorship policy, but claims that he intends to return to the College Park campus in the future to leaflet on behalf of the People's Coalition.

■ The Court is hard-pressed to determine how Fogg has personally suffered an injury that is not conjectural. The record does not reflect when, if ever, Fogg attempted to speak at the University and was denied access. In his deposition, Fogg indicated that he has never attempted to use the University's sponsorship regulation in order to reach a broader class of listeners on the University's campus than he can reach at the Nyumburu Amphitheater or outside the Stamp Student Union. In fact, even if Fogg had illustrated that he had been injured by the policy prior to this law suit, past injury is not sufficient to establish standing; a plaintiff must show a real and immediate threat of repeated injury. *Suhre v. Haywood County,* 131 F.3d 1083, 1090 (4th Cir.1997). Nowhere in the record has Fogg established a specific time when he intends to return to the University campus and attempt to distribute leaflets or engage in public speech. Even considering Fogg's general intentions to return to the University campus, he has not established that he will be unable to make use of the sponsorship policy.

The Court notes that the First Amendment overbreadth doctrine can apply in some First Amendment cases, permitting a party to challenge the constitutionality of a certain provision even if the provision was constitutional as applied to the parties before the court. *Gilles v. Torgersen,* 71 F.3d 497, 501 (4th Cir.1995). "This doctrine, however, only assists plaintiffs who have suffered some injury from application of the contested provisions to begin with." *Id.* The Court finds that Fogg has not suffered any injury from the University's policy. Therefore, summary judgment will, by separate Order, be entered against the Plaintiff Matthew Fogg.

## C. Michael Reeves

Reeves is a member of the LaRouche Movement who has engaged in public speaking and the distribution of literature on behalf of political candidate Lyndon LaRouche ("LaRouche") on the University campus. On April 23, 2003, as part of a political campaign for LaRouche, Reeves sought to distribute leaflets advertising a web-cast aimed at college students that was scheduled to air on the following day, April 24, 2003. Reeves was unable to obtain permission, pursuant to the University policy, to leaflet at Stamp because all available space had been reserved. When Reeves attempted to distribute leaflets at a nearby location, University police issued him a citation and ordered him to leave the College Park campus or he would be arrested for trespassing.

■ The University argues that Reeves' claimed injury is too speculative to establish standing, because he has not identified a specific time when he intends to return to the University campus to distribute leaflets or engage in public speech on behalf of LaRouche's political campaign. However, the Court recognizes that LaRouche is a persistent candidate for political office in the United States. Unlike the plaintiffs in the *Lujan* case who hoped to visit the country of Sri Lanka sometime in the future (*Lujan,* 504 U.S. at 564, 112 S.Ct. 2130), Reeves' intention to return to the University campus on behalf of the LaRouche movement, while unspecific as to a return date, is not so amorphous as a desire to visit a country thousands of miles away from one's country of origin. Moreover, the fact that Reeves has not specified an exact date and time at which he will return to the University campus does not, by itself, defeat standing. "In some instances, courts will relax the prudential limitations [of standing] because they are outweighed by competing considerations. Among those weightier considerations

within the context of the First amendment is the danger of chilling free speech." *Burke*, 139 F.3d at 405 n. 2. The University also argues that Reeves suffered no injury as a consequence of the University's regulations and that *Gilles* should provide guidance to the Court. The central question in *Gilles* was the constitutionality of a sponsorship requirement of the Virginia Polytechnic Institute and State University ("Virginia Tech"), which required any member of the public who wished to engage in public speech on the Virginia Tech campus to first obtain a Virginia Tech sponsor. 71 F.3d at 499. Virginia Tech's sponsorship requirement prevented the plaintiff in that case from speaking in his preferred location, the "drillfield" on Virginia Tech's campus. *Id.* Virginia Tech, instead, sponsored him to speak at an alternative location. *Id.* The court in *Gilles* held that, because the plaintiff ultimately was permitted to speak somewhere on campus, the plaintiff failed " 'to identify any personal injury suffered by [him] *as a consequence* of the alleged constitutional error.' " *Id.* at 501 (quoting *Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 485, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982)) (emphasis in original).

The University posits that this Court should follow the Fourth Circuit's ruling in *Gilles* and find that Reeves has suffered no injury as a result of the University regulation, because he has received a permit to speak on the University campus on multiple other occasions. The Court disagrees. Reeves' injury directly resulted from the University's policy limiting the locale where outsiders can distribute leaflets. Because no space was available under the University's policy, Reeves was not permitted to distribute his leaflets, thus losing all advertisement of the impending webcast. Unlike the plaintiff in *Gilles*, who was ultimately sponsored by Virginia Tech

and permitted to speak on campus, Reeves attempted to comply with the University's policy, but the policy fell short of providing him with a forum. Any injury that Reeves suffered would be a consequence of the University's restrictive policy.

Lastly, the Court determines that a lack of redressability is not a concern in this instance. See *e.g., United States v. Grace,* 461 U.S. 171, 173–74, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983) (the Court reached the merits of the case where protestors who were forced to leave the sidewalk in front of the Supreme Court building claimed that they intended to return to picket the same spot). A ruling favorable to Reeves in this case would provide Reeves redress. Should the Court grant Reeves a declaration that the University regulations violate the First Amendment, the University would be forced to permit outsiders to engage in public speech or leaflet on the same basis as University students and Reeves would be permitted to leaflet anywhere on the University campus, even with short notice.

Therefore, the Court finds that Reeves' claim meets all three standing requirements: he was directly injured when he was not permitted to distribute his leaflets in a timely manner; his injury was a direct result of the University's policy restricting his speech; and a ruling by this Court could potentially redress his grievance with the University. Accordingly, the Court finds that Reeves has standing to sue.

## IV. Unreasonable Time, Place and Manner Restriction.

The First Amendment provides that "Congress shall make no law...abridging the freedom of speech." The first inquiry a court must undertake when a First Amendment claim is asserted is [1] whether the plaintiff has engaged in "protected

speech." If so, the court "must [2] identify the nature of the forum, because the extent to which the Government may limit access depends on whether the forum is public or nonpublic." After identifying the type of forum, the court "must assess [3] whether the justifications for exclusion from the relevant forum satisfy the requisite standard." *Goulart v. Meadows,* 345 F.3d 239, 246 (4th Cir.2003) (citations omitted).

## A. Protected Speech

Both parties agree that political speech of the type in which Reeves wishes to engage is protected speech under the First Amendment.

## B. Type of Forum

The Supreme Court has identified three distinct types of fora for the purposes of the First Amendment, which include the: (1) traditional public forum; (2) the non-public forum; and (3) the limited (designated) public forum. *See Warren v. Fairfax County,* 196 F.3d 186, 190–91 (4th Cir. 1999). The courts distinguish between these fora based upon the physical characteristics of the property, including its location, the objective use of and purposes of the property, and government intent and policy with respect to the property, which may be evidenced by its historic and traditional treatment. *Id* at 191. However, none of these factors is dispositive. *See id.* at 191 (citations omitted).

The traditional public forum requires the government to accommodate all speakers, because these fora have the physical characteristics of a public thoroughfare, a use and purpose which is objectively compatible with expressive conduct and a tradition and history of being used for expressive conduct. *See id.* Examples of traditional public fora include streets, sidewalks, and parks. In a tradi-

tional public forum, the government cannot restrict speech unless the restriction is a content-neutral, reasonable restriction on the time, place and manner of protected speech that is narrowly tailored to serve a significant government interest and that leaves open ample channels for the communication of information. *See id.* at 192.

A non-public forum, by contrast, is one that has never been traditionally opened to the public. *See id.* at 192–93. One characteristic of a non-public forum is that opening it to expressive conduct "will somehow interfere with the objective use and purpose to which the property has been dedicated." *Id.* "Restrictions on speech in nonpublic fora must be viewpoint neutral and reasonable 'in light of the purpose of the forum and all the surrounding circumstances.'" *Id.* [citations omitted.] Restrictions on speech in non-public fora will be upheld if the "speech at issue would interfere with the objective purposes and use of the forum." *Id.*

A third type of forum is the limited or designated public forum, which is not traditionally public but which the government has *purposefully* opened to the public, or some segment of the public, for expressive activity. *See id.* at 193; *Goulart,* 345 F.3d at 249 (a limited public forum is created only by "purposeful government action."). Once a limited or designated public forum has been established, entities of a similar character to those allowed access may not be excluded. *See Goulart* at 250.

In his motion, Reeves asserts that the outdoor areas of the University campus are traditional public fora, because they are sidewalks and streets, which are traditionally considered public fora. In *United States v. Grace,* the Supreme Court examined whether the government could restrict public access to the sidewalks direct-

ly in front of the Supreme Court building. *See* 461 U.S. at 173–74, 103 S.Ct. 1702. In doing so, the Court observed that where sidewalks in front of a building are indistinguishable from sidewalks in any other part of the city, the sidewalks are considered public fora. *Id.* at 179–80, 103 S.Ct. 1702. However, the Court noted that the same result may not follow if the sidewalks were "separated from the streets and sidewalks of the city itself," giving members of the public an indication that they had "entered some special type of enclave." *Id.; see also Warren,* 196 F.3d at 192 ("a single purpose sidewalk physically separated from the rest of municipal sidewalks and part of a class historically subject to restrictions" is not a traditional public forum). The Supreme Court has also observed that a college campus "differs in significant respects from public forums such as streets or parks or even municipal theaters." *Widmar v. Vincent,* 454 U.S. 263, 268, 102 S.Ct. 269, 70 L.Ed.2d 440 n. 5 (1981). According to the opinion in *Widmar,*

> [a] university's mission is education, and decisions of this Court have never denied a university's authority to impose reasonable regulations compatible with that mission upon the use of its campus and facilities. We have not held, for example, that a campus must make all of its facilities equally available to students and non-students alike, or that a university must grant free access to all of its grounds or buildings.

*Id.*

■ Applying these principles to the instant case, the Court concludes that the College Park campus is a limited public forum. The campus is not a public street, park or municipal theatre, the use of which is contemplated or expected by the public at large. Rather, it is an institution of higher learning devoted to the mission of public education. The focus of that mission is, as it should be, on students and members of the University community. As such, it has not traditionally been opened to the public, but rather is "a special type of enclave" devoted to higher education. *Grace,* 461 U.S. at 180, 103 S.Ct. 1702. Indeed, the College Park campus was not open for outsiders to engage in public speech or to distribute leaflets until just three years ago. At that time, the University, through its new policies, purposefully opened its doors to a class of speakers, while excluding others. As a result of this purposeful action, what otherwise would have been a non-public forum became a limited public forum.

While the Court has concluded that the University campus is a limited public forum, the inquiry does not end there. The Court must also address the standard to be applied to the University's exclusions. A limited public forum is subject to two different standards, depending on the extent to which access to the forum is restricted. *See Warren,* 196 F.3d at 193–94. The internal standard applies if the government chooses to exclude a speaker who falls into the class for which the forum was generally made available. *See id.* The external standard applies if the government excludes a person or group of persons for whom the forum was not made generally available. *See id.* The only limit the Constitution places on restrictions upon public access is that, "once a limited forum has been created, entities of a 'similar character' to those allowed access may *not* be excluded." *Id.* at 194 (citing *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 53, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983)). Whether or not someone (or something) is of a "similar character" to the persons (or activities) permitted in the forum depends on the *purpose* of the limited forum. *Goulart,* 345 F.3d at 252. "[I]f the difference be-

tween two proposed uses bears some relationship to the purpose of the facility, then it would make sense for the government to use that difference as a basis for drawing boundaries." *Id.*

In *Goulart,* the Calvert County Northeast Community Center ("Center") did not permit home schooling groups to use the Center for the purpose of holding classes that fulfilled the Maryland state educational requirements. *See* 345 F.3d at 244–45. A home schooling group sued the county, alleging that the policy impermissibly restricted its First Amendment right to free speech. *See id.* at 245. The Fourth Circuit held that "to determine which standard to apply to the Board's exclusion of the plaintiffs in this case, we must determine whether homeschoolers as a group are an entity of a 'similar character' to those groups permitted to use the community centers." *Id.* at 251. The court held that the home school groups were not similar in character to the community members who used the Center for other community activities, because the purpose of the community center is to provide a meeting place for the entire community, not for the purpose of holding classes to obtain academic credits under the educational system of the state of Maryland. *See id.*

■ Similarly, in the present case, the Court must determine if the outsiders, as a group, are of a similar character to University community members who are permitted to speak freely on the University grounds. The "purpose of the limited forum in question should serve as a touchstone for determining the relevant indicia of similarity between two proposed uses." *Id.* at 252. "[A] speaker's purpose can, in certain circumstances, serve as a relevant basis for the government to restrict access to a limited public forum, even when the proposed uses are otherwise identical." *Id.* at 254. The purpose of the College

Park campus is to provide a venue for the students, faculty and staff of the University to obtain an education, not to provide an open meeting place for the unstructured expression of public points of view that are not sponsored or requested by any member of the University community. While there may be similarities in the content of outsider and insider speech, that does not mean that both must be treated the same. "The Supreme Court has repeatedly held that distinctions based on the *status* of the speaker can be a permissible way to limit the scope of the forum." *Goulart* at 253. (emphasis in original) The Fourth Circuit has observed that "the government may draw permissible status-based distinctions among different classes of speakers in order to preserve the purpose of the forum, even when the proposed uses by those inside the permitted class of speakers and those outside the permitted class of speakers are quite similar." *Id.* at 254. Accordingly, the external standard applies due to the obvious and legitimate purpose of the University to preserve the College Park campus for the fulfillment of its primary purpose—the education of students.

## C. Reasonable and Viewpoint Neutral

The Court having concluded that the University campus is a limited public forum, subject to analysis under the external standard, the University's restriction on speech must only be "viewpoint neutral and reasonable in light of the objective purposes served by the forum." *Warren,* 196 F.3d at 194. Reeves argues that even if the Court finds that the University is a limited public forum, the University's restriction on outsider speech is still impermissible under the external analysis because the restriction is not viewpoint neutral and is not reasonable.

The Court rejects this argument.[1]

■ The University's decision to restrict outsider access to the University campus "need only be *reasonable*, it need not be the most reasonable or the only reasonable limitation." *Cornelius v. NAACP Legal Def. and Educ. Fund, Inc.*, 473 U.S. 788, 808, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985) (emphasis in original). In light of the University's intention to reserve its facilities for the use of persons in the College Park community, the meager restriction against outsider speech is reasonable in this case. Outsiders are not denied all access to the University. Instead, they are merely required to reserve a spot five days in advance and are restricted to speaking or distributing leaflets in two of the most highly trafficked areas of the campus.[2] Moreover, if the outsider has a student sponsor, he or she may speak wherever he or she likes. Furthermore, as the Fourth Circuit recognized in *Glover v. Cole*, 762 F.2d 1197, 1203 (4th Cir.1985), a University's resources are limited and the University has an interest in reserving those resources for University community members. It makes sense to permit outsiders to engage in public expression only at Nyumburu and Stamp because both locales are close to areas where the University staff members are located. Furthermore, opening up the entire campus to the public would require that the University's limited staff be dispersed throughout the College Park campus to supervise outsiders who are less familiar with the University rules. *See e.g., id.* In light of the foregoing facts, the University's restriction against outsider speech is both viewpoint neutral and reasonable.

## V.  Unconstitutional Prior Restraint

Finally, Reeves argues that the University's regulation on outsider speech is an impermissible prior restraint because it places "unbridled discretion" in the hands of the University officials. *See 11126 Baltimore, Blvd., Inc. v. Prince George's County, Md.*, 58 F.3d 988, 993–94 (4th Cir.1995). What Reeves seeks is the freedom to roam the University campus at will and hand out leaflets to University students, something which the Constitution does not permit him to do. *See Griffin v. Dep't of Veterans Affairs*, 274 F.3d 818, 825 (4th Cir.2001) (a regulation limiting the display of a confederate flag is not an

---

1.  As evidence of a lack of viewpoint neutrality, Reeves points to a protest staged by the Westboro Baptist Church, an isolated incident which this Court does not find persuasive. On one occasion, the University permitted a church group to protest a showing of "The Laramie Project," a play concerning community reaction to the killing of a homosexual college student, away from Nyumburu and in front of the play's location. The University permitted this protest at that location, because the University's First Year Book Program included a discussion of "The Laramie Project" and the University thought an outside protest would help foster more discussion among those students involved in the First Year Book Program. "[W]hile [a] 'restriction must not discriminate against speech [or speaker] on the basis of viewpoint,' the restriction is permissible so long as it is 'rea-

sonable in light of the *purpose* served by the forum.'" *Goulart*, 345 F.3d at 259 (citing *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106–07, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001)) (emphasis added). The purpose served by the University is education and permitting the Westboro Baptist Church to protest in this single instance furthered that purpose.

2.  Reeves' reliance on *Multimedia Publ'g Co. v. Greenville–Spartanburg Airport District*, 991 F.2d 154 (4th Cir.1993), is misplaced. In that case, the court held that an airport commission's total ban on the placement of newspaper racks in airports was not reasonable under the circumstances. *Id.* In this case, there is not a total ban on any outsider speech, only a reasonable limitation.

unconstitutional prior restraint in a "non-public forum not open to such"). Because the University is a limited public forum, the University can constitutionally exclude outsider speech so long as the exclusion is viewpoint neutral and reasonable. The Court has already determined that the University's regulation does not violate the Constitution and thus, the regulation cannot be an impermissible prior restraint.

Accordingly, summary judgment will by separate Order, be entered against the Plaintiff, Michael Reeves.

## ORDER

Upon consideration of the parties' cross-motions for summary judgment and for the reasons stated in the accompanying memorandum opinion, it is this 15th day of June, 2004, by the United States District Court for the District of Maryland,

**ORDERED**, that the Plaintiffs' Motion For Summary Judgment [Paper no. 36] is **DENIED**, and it is further

**ORDERED**, the Defendant's Cross–Motion For Summary Judgment [Paper no. 40] is **GRANTED**; and it is

**FURTHER ORDERED**, that summary judgment is entered in favor of the Defendant; and it is

**FURTHER ORDERED**, that the Clerk is directed to **CLOSE** this case.