MELLOY, Circuit Judge.
Plaintiff-Appellant Gary Bowman filed this civil rights lawsuit pursuant to 42 U.S.C. § 1983 against Defendants-Appellees John A. White, Donald O.- Pederson, and Larry L. Slammons as officials repre *972 senting the University of Arkansas at Fayetteville (collectively hereinafter known as the “University”). Bowman alleges that the University’s policy regarding the use of its facilities and space, which contains restrictions on use by non-University entities, unconstitutionally abridges his right to free speech. Following a plenary hearing on the merits of Bowman’s request for injunctive relief, the district court dismissed his complaint with prejudice. The district court found that the University’s campus was a nonpublic forum and that all the challenged restrictions on speech were reasonable. Bowman now brings this timely appeal.
I.
■ Gary Bowman is a professing Christian who engages in street preaching about his religious beliefs and convictions as a tenet of his faith. His message typically concerns sin, repentance and a final judgment. He states that he shares his message in the hope of securing salvation for his audience. He employs various means of communication, including the use of signs, public speaking, literature distribution, symbolic speech, and one-on-one conversation.
Bowman particularly wants to share his religious message with college students and others found at public universities because of what he deems tfo be a moral obligation. To this end, he preaches at many college campuses, including the University of Arkansas at Fayetteville. Bowman considers the University a uniquely suitable place to communicate his message because of its close proximity to his residence in Oklahoma and the significant number of students that can be found in outdoor areas.
The University is the flagship campus of the University of Arkansas System. It has an enrollment of more than 16,000 students. In an attempt to regulate an ever-increasing demand on the use of its facilities, the University enacted Fayetteville Policies and Procedures 708.0, entitled “Use of University Facilities and Outdoor Space” (the “Policy”). The Policy comprehensively governs the use of University outdoor space.[1] It contains guidelines and procedures for space allocation and reservations. The Policy applies to all areas within the University’s direct control, including its streets, sidewalks, and parks.
The Policy distinguishes between University Entities and Non-University Entities. Under the Policy, Bowman is classified as a Non-University Entity.[2] The Policy places a five-day cap per semester per entity on the use of facilities and outdoor space by Non-University Entities. In addition to the five-day cap, the Policy requires Non-University Entities to make reservations in advance of their use of a space. A reservation allows a Non-University Entity to use the outdoor space for one eight-hour day. A reservation is required regardless of the use that will be made of the space, whether that use be speaking, carrying signs, handing out literature, or sitting silently. The Policy does not, however, regulate one-on-one conversations. The Policy also imposes a three-business-day advance notice requirement for the use of space by Non-University Entities. The Policy prohibits a Non-University Entity’s use of space from interfering with the educational mission of the *973 University and allows the University to cancel or modify a space reservation in the event that a use does interfere. The Policy further prohibits the use of space by Non-University Entities during so called “dead days,” which consist of one quiet study day per semester, all final exam periods, and dates of commencement activities.
In the fall of 1998, Bowman obtained permits to appear twice on campus for speaking purposes. Bowman returned to the University in the fall of 2000, at which time he complained to University officials that the permit requirement was imposing a significant restraint on his speech. According to Bowman, it was more difficult for him to plan the days he wished to speak in advance because he could not determine with any certainty his future work schedule or whether a noteworthy event would prompt him to want to speak on a certain day.
To alleviate these concerns, the University granted Bowman blanket permission to appear on campus and communicate his message during the fall semester. With the blanket permission in place, Bowman spoke approximately twenty times in the fall of 2000. Despite having blanket permission to speak on campus, Bowman discovered he needed a permit for any other form of expression. Bowman was not permitted to hand out literature, use signs, or engage in symbolic protests without first obtaining a permit.
Bowman often used inflammatory language and tactics in his presentations, the nature of which were considered highly offensive by many students. During the fall semester of 2000, several students and faculty members complained of Bowman’s presence on campus. Campus police, in response to these complaints, occasionally had to curb violent outbursts and erect barricades to maintain crowd control as Bowman sometimes drew crowds as large as 200 people.
In the spring semester of 2001, the University denied Bowman blanket permission to speak. As a result, Bowman submitted individual requests for permits to speak on selected days. By letter, the University advised Bowman that it would only consider up to three separate space reservation forms at any one time. The letter further indicated that the campus speech policies “are currently under review and are likely to be revised in the future.” That semester, Bowman was denied permission to speak on the University’s dead days.
For the next fall, Bowman planned a series of presentations entitled “Ten Commandments,” which was to be part of a larger series entitled “Forty Things Every Student Needs to Know.” During each campus visit, he anticipated covering one Commandment and one “Thing Every Student Needs to Know.” Bowman applied for individual permits to cover each of the first six Commandments.
In the meantime, the University formally revised the Policy to its current form. By letter dated August 21, 2001, the University informed Bowman of the revisions and approved, in part, his request for use of the grounds by granting him three days in which to present his message. Bowman, in a letter outlining his concerns regarding the Policy, subsequently requested an additional seven days. The University, citing its new five-day cap, denied Bowman a permit for the additional seven days. Bowman resubmitted his permit application, requesting an additional three days, for a total of six days. The University granted him permission for two days, but denied permission for the third day, citing the five-day cap. Bowman proceeded with his speech on the days he was allowed to speak, covering the first five Commandments. Due to the five-day cap, *974 Bowman was precluded from sharing his message for the rest of the fall semester of 2001.
During the spring semester of 2002, Bowman once again utilized his five permitted days. Bowman applied for a sixth visit. His request was denied under the five-day cap.
Later that spring, with the sponsorship of a student organization, Bowman attempted again to speak on a sixth day. The University approved the appearance, but required a representative of the student organization to be with Bowman at all times while Bowman remained on campus. Bowman was forced to cease his expression whenever the representative was not present.
Unable to resolve his differences with the University, Bowman filed the present lawsuit alleging that the permit requirement, five-day cap, three-day advance notice requirement, and dead day ban are unconstitutionally vague, overbroad, and discriminatory as applied to him, in violation of the First and Fourteenth Amendments to the United States Constitution. He sought declaratory and injunctive relief as well as damages under 42 U.S.C. § 1988.
After previously dismissing his claim for compensatory damages, the district court held a plenary hearing pursuant to Fed. R.Civ.P. 65(a)(2), consolidating the preliminary injunction hearing with a trial on the merits of his complaint. At the conclusion of the hearing, the district court dismissed Bowman’s complaint because it found the University to be a nonpublic forum and all the challenged restrictions on speech to be reasonable.
Bowman filed a timely notice of appeal pursuant to Fed. R.App. P. 4(a), thereby invoking our jurisdiction over the appeal under 28 U.S.C. § 1291. We review de novo the district court’s conclusions of law. Doe v. Pulaski County Special Sch. Dist., 306 F.3d 616, 621 (8th Cir.2002). There are no material facts in dispute.
II.
“[S]tate colleges and universities are not enclaves immune from the sweep of the First Amendment.” Healy v. James, 408 U.S. 169, 180, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972). However, “the First Amendment does not guarantee access to property simply because it is owned or controlled by the government.” Perry Educ. Ass’n v. Perry Local Educators’ Ass’n, 460 U.S. 37, 46, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983) (internal quotations omitted). “The existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue.” Id. at 44, 103 S.Ct. 948. To this end; the Supreme Court uses a forum analysis for evaluating restrictions of speech on government property. See id. at 45-46, 103 S.Ct. 948. The forum analysis initially requires a court to determine whether a property is a traditional public forum, a designated public forum, or a nonpublic forum. Families Achieving Independence & Respect v. Neb. Dep’t of Soc. Servs., 111 F.3d 1408, 1418 (8th Cir.1997). Once a court makes a determination on the nature of the forum, it then applies the appropriate standard of scrutiny to decide whether a restriction on speech passes constitutional muster. See, e.g., Ark. Educ. Television Comm’n v. Forbes, 523 U.S. 666, 677-683, 118 S.Ct. 1633, 140 L.Ed.2d 875 (1998) (hereinafter “Forbes”); United States v. Kokinda, 497 U.S. 720, 726-27, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990). Thus, the extent to which access to, and the character of speech upon, government property may be *975 limited depends upon the nature of the forum in which the speech takes place. Burnham v. Ianni, 119 F.3d 668, 675 (8th Cir.1997).
A. Traditional Public Forum
The government’s ability to restrict speech is most circumscribed in a traditional public forum. Perry, 460 U.S. at 45, 103 S.Ct. 948 (“In places which by long tradition or by government fiat have been devoted to assembly and debate, the rights of the state to limit expressive activity are sharply circumscribed.”). A traditional public forum is a type of property that “has the physical characteristics of a public thoroughfare, ... the objective use and purpose of open public access or some other objective use and purpose inherently compatible with expressive conduct, [and] historically] and traditionally] has been used for expressive conduct.... ” Warren v. Fairfax County, 196 F.3d 186, 191 (4th Cir.1999) (citations omitted). “‘[P]ublie places’ historically associated with the free exercise of expressive activities, such as streets, sidewalks, and parks, are considered, without more, to be ‘public forums.’ ” United States v. Grace, 461 U.S. 171, 177, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983).
A content-based restriction on speech within a traditional public forum must be necessary to serve a compelling government interest and be narrowly drawn to achieve that interest. Perry, 460 U.S. at 45, 103 S.Ct. 948. A restriction on speech that is not content-based and that restricts the time, place or manner in which speech may be communicated is subjected to a different, less restrictive standard. Id. The government may enforce a reasonable, content-neutral time, place and manner restriction in a traditional public forum if the restriction is narrowly tailored to serve a significant government interest and leaves open ample alternative channels of communication. Id.
B. Designated Public Forum
A designated public forum is a nonpublic forum the government intentionally opens to expressive activity for a limited purpose such as use by certain groups or use for discussion of certain subjects. Perry, 460 U.S. at 46, 103 S.Ct. 948. “The government does not create a [designated] public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional public forum for public discourse.” Forbes, 523 U.S. at 677, 118 S.Ct. 1633 (internal quotations omitted) (alteration in original).
Despite this direction from the Supreme Court, our Circuit’s analysis of what constitutes a “designated public forum,” like our sister Circuits’, is far from lucid. Substantial confusion exists regarding what distinction, if any, exists between a “designated public forum” and a “limited public forum.” See generally, Chiu v. Plano Indep. Sch. Dist., 260 F.3d 330, 345-46 & nn. 10-12 (5th Cir.2001). As the First Circuit pointed out in a footnote in Ridley v. Mass. Bay Transp. Auth., 390 F.3d 65, 76 n. 4 (1st Cir.2004), “The phrase ‘limited public forum’ has been used in different ways.” ’ The First Circuit accurately states that the phrase has been used as a synonym for the term “designated public forum” and also for the phrase “nonpublic forum.” Id. The Second Circuit has articulatéd the view that the phrases “designated public forum” and “limited public forum” are not synonyms. See, e.g., N.Y. Magazine v. Metro. Transp. Auth., 136 F.3d 123, 128 & n. 2 (2d Cir.1998) (describing a limited public forum as a “sub-category of the designated public forum, where the government ‘opens a non-public forum but limits the expressive activity to certain kinds of speakers or to the discussion of *976 certain subjects.’ ” (quoting Travis v. Owego-Apalachin Sch. Dist., 927 F.2d 688, 692 (2d Cir.1991))); see also Chiu, 260 F.3d at 346 n. 12. A designated public forum can be classified as either “of a limited or unlimited character.” Van Bergen v. Minnesota, 59 F.3d 1541, 1553 n. 8 (8th Cir.1995).
Under this analysis, a “limited public forum is a subset of the designated public forum [that] arises ‘ “where the government opens a non-public forum but limits the expressive activity to certain kinds of speakers or to the discussion of certain subjects.” ’ ” Make the Road By Walking, Inc. v. Turner, 378 F.3d 133, 143 (2d Cir.2004) (quoting Hotel Employees & Rest. Employees Union Local 100 of N.Y. v. City of N.Y. Dep’t of Parks & Recreation, 311 F.3d 534, 545 (2d Cir.2002)) (quoting N.Y. Magazine v. Metro. Transp. Auth., 136 F.3d 123, 128 n. 2 (2d Cir.1998)). For example, a university concert hall might be considered a “limited public forum,” designated for particular speech by university-supported musicians. An “unlimited” designated public forum is a forum designated for expressive conduct by the government but not limited to a particular type of speech or speaker.
The distinction between a limited designated public forum and an unlimited designated public forum is significant because it controls the level of scrutiny given to restrictions on speech. Like the government’s ability to restrict speech in a traditional public forum, the government’s ability to restrict speech in an unlimited designated public forum is sharply circumscribed. Perry, 460 U.S. at 45, 103 S.Ct. 948. In an unlimited designated public forum, the government may enforce a content-neutral time, place, and manner restriction only if the restriction is necessary to serve a significant government interest and is narrowly drawn to achieve that interest. Perry, 460 U.S. at 46, 103 S.Ct. 948. In contrast, in a limited designated public forum, “[r]estrictions on speech not within the type of expression allowed in a limited public forum must only be reasonable and viewpoint neutral.” Turner, 378 F.3d at 143.
C. Nonpublic Forum
The government can most freely restrict speech in a nonpublic forum. A nonpublic forum is government property which is not classified a traditional public forum or designated public forum. Warren, 196 F.3d at 192. In a nonpublic forum, the government may restrict speech “ ‘as long as the restrictions are reasonable and [are] not an effort to suppress expression merely because the public officials oppose [a] speaker’s view.’ ” American Civil Liberties Union of Nevada v. City of Las Vegas, 333 F.3d 1092, 1098 (9th Cir.2003) (quoting Sammartano v. First Judicial Dist. Court, 303 F.3d 959, 966 (9th Cir.2002)).
Accordingly, when analyzing how to classify a forum we must ask two questions. First, is the space a traditional public forum, a designated public forum, or a nonpublic forum? Second, if the space is a designated public forum, is the forum limited or unlimited in its character?
III.
The district court found that the campus of the University of Arkansas at Fayetteville is not a public forum. We disagree. The facts of this case show that the University’s grounds cannot be labeled as only one type of forum and that the areas in question in this case are unlimited designated public fora.
A modern university contains a variety of fora. Its facilities may include private offices, classrooms, laboratories, *977 academic medical centers, concert halls, large sports stadiums and arenas, and open spaces. The University of Arkansas at Fayetteville is this type of institution. Its open spaces, like those at most major universities, come in a number of different types. Some are enclosed quadrangles bordered on all sides by university buildings and traversed by sidewalks, while others are grassy areas or plazas on the edge of campus where the University’s grounds abut the city property. Thus, labeling the campus as one single type of forum is an impossible, futile task. See Justice for All v. Faulkner, 410 F.3d 760, 766 (5th Cir.2005) (stating that “the Supreme Court’s forum analysis jurisprudence does not require us to choose between the polar extremes of treating an entire university campus as a forum designated for all types of speech by all speakers, or, alternatively, as a limited forum where any reasonable restriction on speech must be upheld”); see also Ala. Student Party v. Student Gov’t Ass’n, 867 F.2d 1344, 1354 n. 6 (11th Cir.1989) (Tjoflat, J., dissenting) (stating that not all of a University campus is a public forum, but rather that a campus contains a variety of fora). Some places on the University’s campus, such as the administration building, the president’s office, or classrooms are not opened as fora for use by the student body or anyone else. As Bowman concedes, these aneas are nonpublic fora. Other campus locations, such as auditoriums or stadiums allow for certain speech on certain topics. These locations may be described as designated public fora. Further, the public streets and sidewalks which surround the campus but are not on the campus likely constitute traditional public fora. Grace, 461 U.S. at 177, 103 S.Ct. 1702. Accordingly, rather than attempt to label the entire campus as one type of forum, we will discuss only the specific areas at issue in this case.
Bowman desires to speak at various locations throughout the campus including the streets, sidewalks, and open areas located inside and directly adjacent to the campus. Specifically at issue in this case, Bowman desires to speak at the outdoor areas clearly within the boundaries of the campus known as the Union Mall,[3] the Peace Fountain[4] and Brough Commons,[5] presumably because of the high concentration of students in these locations.
The objective evidence in the record shows these particular areas combine the physical characteristics of streets, sidewalks, and parks, and are open for public passage. They do not include university buildings or stadiums, but they are located within the boundaries of the cam *978 pus. The Union Mall and Peace Fountain are completely surrounded by University buildings. The physical characteristics of these spaces, “without more,” might make them traditional public fora. Grace, 461 U.S. at 177, 103 S.Ct. 1702; Hague v. Comm. for Indus. Org., 307 U.S. 496, 515, 59 S.Ct. 954, 83 L.Ed. 1423 (1939) (“Wherever the titles of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.”). However, “[p]ublicly owned or operated property does not become a ‘public forum’ simply because members of the public are permitted to come and go at will.” Grace, 461 U.S. at 177, 103 S.Ct. 1702. Rather, the open nature of these spaces is merely a factor to consider in determining whether the government has opened its property. Grace, 461 U.S. at 177, 103 S.Ct. 1702. We must also examine the traditional use of the property, the objective use and purposes of the space, and the government intent and policy with respect to the property, not merely its physical characteristics and location.[6] In particular, we must acknowledge the presence of any special characteristics regarding the environment in which those areas exist. See, e.g., Tinker v. Des Moines Indep. Sch. Dist., 393 U.S. 503, 506, 89 5.Ct. 733, 21 L.Ed.2d 731 (1969) (noting the “special characteristics of the school environment”); Greer v. Spock, 424 U.S. 828, 838-40, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976) (discussing the unique nature of military bases and the fact that these circumstances must be taken into consideration).
In the case of the University, although it “possesses many of the characteristics of a public forum,” such as open sidewalks, “[it] differs in significant respects from public forums such as streets or parks or even municipal theaters.” Widmar v. Vincent, 454 U.S. 263, 268 n. 5, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981). A university’s purpose, its traditional use, and the government’s intent with respect to the property is quite different because a university’s function is not to provide a forum for all persons to talk about all topics at all times. Rather, a university’s mission is education and the search for knowledge — to serve as a “ ‘special type of enclave’ devoted to higher education.” ACLU Student Chapter — Univ. of Md., College Park v. Mote, 321 F.Supp.2d 670, 679 (D.Md.2004) (quoting Grace, 461 U.S. at 180, 103 S.Ct. 1702); see Widmar, 454 U.S. at 268 n. 5, 102 S.Ct. 269 (“We have not held, for example, that a campus must make all of its facilities equally available to students and nonstudents alike, or that a university must grant free access to all of its grounds or buildings.”). Thus, streets, sidewalks, and other open areas that might otherwise be traditional public fora may be treated differently when they fall within the boundaries of the University’s vast campus.
The University argues that the areas at issue should be treated as nonpublic fora. This argument is contrary to how the University itself, through its policies and procedures, has treated the Union Mall, the Peace Fountain, and the Brough Commons. The Policy, which permits speech by University and Non-University Entities, offers strong evidence that the University “intentionally openfed]” areas of the campus “for public discourse.” Forbes, 523 U.S. at 677, 118 S.Ct. 1633 (internal quotation omitted). The Policy expressly states that it applies to “facilities or outdoor space ... for use by University entities and Non-University entities.” Fayetteville Policies and Procedures, “Use *979 of University Facilities and Outdoor Space” 708.0(A). The Policy governs the specific areas at issue here. The only use of the space that is prohibited is any activity by private, for-profit businesses. 708.0(A). Further, the Policy indicates that the University has opened up the campus generally, not merely “to either a specific group of speakers or for discussion on a very1 narrow topic.” Bourgault v. Yudof, 316 F.Supp.2d 411, 420 (N.D.Tex.2004). The Policy provides strong evidence that the University, like many public colleges, has opened select portions of its campus “to facilitate discussion on issues of public concern.” Id. As such, the Policy indicates that the University itself designated the areas in question as locations for free expression.
College campuses traditionally and historically serve as places specifically designated for the free exchange of ideas. Healy, 408 U.S. at 180, 92 S.Ct. 2338 (stating that universities represent a “marketplace of ideas”). The Supreme Court has advanced the idea that universities have traditionally opened parts of their campuses to speech.
Th[e] danger [of chilling speech] is especially real in the University setting, where the State acts against a background and tradition of thought and experiment that is at the center of our intellectual and philosophic tradition---[U]niversities began as voluntary and spontaneous assemblages or concourses for students to speak and to write and to learn. The quality and creative power of student intellectual life to this day remains a vital measure of a school’s influence and attainment.
Rosenberger v. Rector & Visitors of the Univ. of Va., 515 U.S. 819, 835-36, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) (citations omitted). Indeed, in times of great national discussion, such as during the height of the Vietnam War or the debate over the war in Iraq, college campuses serve as a stage for societal debate. Often those speaking on college campuses are not enrolled students, but rather people like Bowman, who travel from campus to campus to spread their message. Thus, public university campuses historically contain places where space is specifically designated by society and universities themselves for speech.
This tradition of free expression within specific parts of universities, the University’s practice of permitting speech at these locations, and the University’s past practice of permitting both University Entities and Non-University Entities to speak at these locations on campus demonstrate that the University deliberately fosters an environment that permits speech “subject to the limits necessary to preserve the academic mission and to maintain order.” Hays County Guardian v. Supple, 969 F.2d 111, 117 (5th Cir.1992) (finding certain outdoor areas of a university to be a designated public forum, designated for the speech of students). Accordingly, we hold that the specific property at issue— the Union Mall, Peace Fountain, and Brough Commons — are designated public fora. This holding does not apply to any other areas on the University campus, about which we express no opinion.
We must next decide whether the forum is limited or unlimited in its character. In this case, although the University gives preferential treatment to University Entities over Non-University Entities in regard to use of University space, there is little evidence that the University intended to limit the use of University space to a particular type of speech or speaker. Accordingly, we hold that the spaces at issue are unlimited designated public fora.
*980 IV.
Having concluded that the outdoor areas in question are unlimited designated public fora, we must ascertain whether the Policy impermissibly restrains free expression. We analyze the University’s time, place, and manner restrictions using the appropriate scrutiny standard, which requires a restriction on speech to be content-neutral and narrowly tailored to serve a significant government interest. Perry, 460 U.S. at 45, 103 S.Ct. 948.
There is no evidence that the Policy is anything but content neutral. Our analysis, therefore, focuses on whether the Policy is narrowly tailored to serve a significant government interest. The University has identified a number of interests that justify a restriction on speech. One significant interest is protecting the educational experience of the students in furtherance of the University’s educational mission.[7] This interest is significant because an educated electorate is essential to the vitality of our democracy and a lack of proper education diminishes the value of our free speech rights. See Keyishian v. Bd. of Regents of the Univ. of the State of N.Y., 385 U.S. 589, 603, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967) (“The Nation’s future depends upon leaders trained through wide exposure to that robust exchange of ideas .... ”). A second significant interest is in ensuring public safety. Like education, safety is a fundamental human need without which the desire to speak one’s mind becomes moot. See Heffron v. Int’l Soc’y for Krishna Consciousness, Inc., 452 U.S. 640, 650, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981) (“As a general matter it is clear that a State’s interest in protecting the ‘safety and convenience’ of persons using a public forum is a valid governmental objecfive.”). Finally, a third significant interest asserted by the University is the fostering of a diversity of uses of University resources.
A regulation is narrowly tailored when it furthers a significant government interest that would be achieved less effectively without the regulation. Thorburn v. Austin, 231 F.3d 1114, 1120 (8th Cir.2000). The statute does not, however, need to be the least restrictive means of regulation possible. Id. Accordingly, we next analyze whether each of the time, place and manner restrictions imposed by the University are sufficiently narrowly tailored to meet one or more of the significant government interests described above.
A. Permit Requirement
The University’s requirement that a Non-University Entity obtain a permit before “using” outdoor space is a prior restraint on speech against which there is a heavy presumption of unconstitutionality. Forsyth County v. The Nationalist Movement, 505 U.S. 123, 130, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992). The government “may impose a permit requirement on those wishing to hold a ... rally.” Id. This permit may only be imposed, however, if it does not delegate overly broad licensing discretion to a government official, is content-neutral, is narrowly tailored to the University’s significant governmental interests, and leaves ample alternative channels for communication. Id.
The University’s policy does not delegate overly broad discretion to its officials, nor does it allow the denial or revocation of permits on the basis of content. The Policy applies to all not-for-profit *981 Non-University Entities.[8] The Policy grants the University the right to deny or revoke a permit for the use of a space by a Non-University Entity only for limited reasons, such as interference with the educational activities of the institution.
The University has a significant public safety interest in requiring a permit because of the time and resources necessary to accommodate the crowds that Bowman attracts. See Thomas v. Chicago Park Dist., 534 U.S. 316, 322, 122 S.Ct. 775, 151 L.Ed.2d 783 (2002) (upholding a requirement that individuals obtain a permit before conducting events in public parks involving fifty or more people); see also Grossman v. City of Portland, 33 F.3d 1200, 1206 (9th Cir.1994) (“Some type of permit requirement may be justified in the case of large groups, where the burden placed on park facilities and the possibility of interference with other park users is more substantial.”). Bowman argues that the Thomas and Grossman analyses are not applicable to him because he is a single speaker. This argument fails because regardless of whether Bowman is speaking alone or with others, carrying a sign, or handing out literature, he has demonstrated the capacity to attract a crowd and disrupt the unique educational environment. See Mote, 321 F.Supp.2d at 679. In fact, the majority of Bowman’s space reservation requests listed an estimated attendance of between fifty and one hundred people, analogous to the situation in Thomas. The actual attendance at his events has run as high as two hundred people. Under these circumstances, the permit requirement is justified to “coordinate multiple uses of limited space,” “assure preservation of the [campus],” “prevent uses that are dangerous” to students or other people, and “to assure financial accountability for damage” caused by Bowman’s event. Thomas, 534 U.S. at 322, 122 S.Ct. 775.
The University’s permit requirement is narrowly tailored to meet these significant interests. The University’s requirement that Non-University Entities notify the University in advance of their intent to use its facilities does not burden substantially more speech than is necessary to further the University’s interests. These interests include ensuring public safety, minimizing the disruption of the educational setting, and coordinating the use of limited space by multiple entities. Further, the University’s requirement leaves open ample alternative channels for communication. Accordingly, although the Policy admittedly does burden Bowman’s speech by requiring him to plan sufficiently in advance to obtain a permit, it is not overly burdensome so as to make the permit requirement unconstitutional.
B. Five-Day Cap
In addition to the permit requirement, the University regulates the time in which a speaker may speak by imposing a cap of five, eight-hour days per semester. If a speaker requests a sixth day, the University will deny the permit. The University explains that the five-day cap allows the speaker, on a semester basis, the same number of access hours as expended on a typical three-semester-hour class. The University argues that the five-day cap fosters a diversity of usage, prevents monopolization of space and preserves the property’s tax-exempt status.
The University’s interest in fostering a diversity of viewpoints and avoiding the monopolization of space serves a significant interest. However, the five-day cap is not sufficiently narrowly drawn to achieve that interest. The Policy as writ *982 ten does not by itself foster more viewpoints; it merely limits Bowman’s speech. If no one else wants to use the space after Bowman has used his five permits, the space will go unused even if Bowman still wants to use the space. A more narrowly tailored policy might grant Bowman more than just five days per semester to speak if the space is not being used, but give preference to other speakers who have not already obtained five permits. Furthermore, a policy that allows speakers to obtain permits for a limited number of events at any one time might be permissible to further the significant interest of keeping spaces open for an array of groups and a diversity of uses. This type of policy would further the University’s interest in preventing a single entity from monopolizing a specific space by reserving that space for an entire semester with a single permit request.
Although the five-day cap might increase the odds that the space will be available for informal use, this rationale is not a sufficient justification in light of the disfavor with which restrictions on speech are viewed. The University’s limitation is not narrowly tailored to achieve its interest in fostering a diversity of viewpoints and avoiding monopolization of space. Accordingly, we conclude that the five-day cap is an unnecessary abridgment of Bowman’s speech rights, and therefore unconstitutional.
C. Three-Day Notice Requirement
The University requires three-days’ advance notice. Bowman argues that the advance notice requirement effectively bars him from engaging in constitutionally protected spontaneous speech. The University asserts that the notice requirement is necessary to allow it to plan for exigencies such as crowd control and insurance requirements. This court stated in Douglas v. Brownell, 88 F.3d 1511, 1523-24 (8th Cir.1996), that a five-day advance notice requirement for a permit was not narrowly tailored. We noted, however, that advance notice requirements of three days or fewer have been upheld by courts as sufficiently narrowly tailored. Id. at 1523. The case at bar is distinguishable from Douglas in at least two ways. First, the notice requirement is only three days. Second, a university is less able than a city or other entity with police powers to deal with a significant disruption on short notice. Mote, 321 F.Supp.2d at 681 (“a University’s resources are limited and the University has an interest in reserving those resources for University community members”); see also Glover v. Cole, 762 F.2d 1197, 1203 (4th Cir.1985) (“[a] college has a right to preserve the campus for its intended purpose and to protect college students from the pressures of solicitation”). In light of the modest nature of the requirement and what the district court described as the University’s reduced capacity to address “the exigencies of determining what, if any, security, crowd control, additional insurance, etc., will be required for a particular event,” we conclude that the advance notice requirement is sufficiently narrowly tailored, and thus permissible.
D. Dead Day Ban
The University bans Non-University Entities from using its space during so-called “dead days.” The University explains that “dead days” are the official final examination periods, which allow students to study for and take final exams in a peaceful, quiet environment, and the dates of official University commencement activities. Protecting the educational experience of the students by preserving limited quiet study and exam-taking time is a significant government interest. The University has shown that Bowman’s activities *983 such as preaching, passing out literature, or carrying a sign could very easily interfere with a student’s educational experience by causing a noise disturbance. For example, carrying a sign, though silent as an action, might provoke noisy, disruptive confrontations.
Bowman argues that the dead day ban is underinclusive because it leaves a substantial amount of seemingly intrusive conduct unregulated, in that it allows speech by University Entities, which could be just as intrusive as speech by Non-University Entities. See City of Ladue v. Gilleo, 512 U.S. 43, 52-53, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994) (stating that exceptions to a regulation of speech may diminish government’s credibility in justifying its regulation). This underinclusivity, however, does not necessarily undermine the credibility of the university’s rationale for limiting access during examination and commencement periods. The underinclusive regulation of speech in Ladue was a “red flag” that rendered “implausible the government’s claim that the regulation ... [wa]s narrowly tailored,” National Federation of the Blind v. Federal Trade Commision, 420 F.3d 331, 345-46 (4th Cir.2005), but a limitation on speech that is not all-encompassing may still be narrowly tailored where the underinclusivity does not favor a particular viewpoint or undermine the rationale given for the regulation. Id.; Children of the Rosary v. City of Phoenix, 154 F.3d 972, 982 (9th Cir.1998); ISKCON of Potomac, Inc. v. Kennedy, 61 F.3d 949, 957-58 (D.C.Cir.1995).
Here, the university reasonably justified a modification of its unlimited designated forum during discrete times of the academic year when an abundance of speakers would be likely to interfere with the educational mission. During these periods, the university restricts not only outside speakers like Bowman, but also university-related activities (such as athletic contests and work on the physical plant) that have a potential to hinder students in their preparation for examinations. (Appellant’s App. at 290-91). We think it was reasonable for the administration to conclude that University Entities who do reserve space in the designated forums on these dates are more likely to be attuned to the special needs of the university community during examination and commencement periods (see id. at 341), and thus less likely to disrupt the campus during these sensitive times. In effect, the university has elected to limit the designated forums to certain classes of speakers during these narrow windows in the academic year, and it is well established that the government is not required “to indefinitely retain the unlimited open character of’ a designated public forum. Perry, 460 U.S. at 46, 103 S.Ct. 948. Accordingly, we conclude that the dead day ban passes constitutional muster.
V.
For the foregoing reasons, we conclude that the University’s permit requirement, notice requirement, and dead day ban are constitutional, but that the five-day cap is insufficiently narrowly tailored to survive. Accordingly, we affirm in part and reverse in part.

. Use of indoor space is governed by individual use policies which are not at issue in this case.

. It should be noted, however, that on one occasion Bowman was able to obtain sponsorship from a student organization which allowed him to reserve space as a University Entity.

. The Union Mall is located in the center of campus between the library and Union Mall facility. It is an outdoor area composed of grassy mounds surrounded by sidewalks and walkways, benches, and potted trees and plants. A bike rack, basketball hoop, fountain and street lamps appear in pictures depicting the area. The Union Mall hosts a variety of organized events such as political gatherings and musical events. Students use the Union Mall to sit on its benches and lay on its grass to read, study, and talk to one another.

. The Peace Fountain is located in the center of campus and hosts a variety of organized and unorganized events. The Peace Fountain is a metallic tower structure with a fountain of water at the base. A cemented area with potted trees and plants surrounds the fountain. Sidewalks run through and parallel to the Peace Fountain. A statue and small stone wall appear in pictures of the area.

.The Brough Commons building is an on-campus eating facility, but the area in question is outside the building at the intersection of Dickson Street and Ozark Street. Dickson Street runs from downtown Fayetteville and dead-ends in part of the campus. The area in question consists of a large sidewalk with some landscaping featuring trees and plants. The area also contains a historical marker memorializing the acquisition of the farmland on which the University sits.

. It must be noted that none of these factors are dispositive.

. This interest includes the University's interest in preserving University Entities' priority for the space in furtherance of that mission.

. The Policy gives the University broad discretion to deny permits to for-profit entities.